2019 IL App (3d) 150595

Opinion filed January 4, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-15-0595 |
| v. | ) ) | Circuit No. 13-CF-382 |
| RICHARD FELTON, | ) ) ) | Honorable Cynthia M. Raccuglia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice McDade concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Defendant, Richard Felton, appeals following his convictions for home invasion and attempted first degree murder in separate trials. He argues that (1) an excessive amount of evidence of home invasion was introduced at his attempted first degree murder trial, (2) the mandatory 25-years-to-life firearm enhancement is unconstitutionally vague, (3) the sentences imposed by the circuit court were excessive, and (4) the mittimus should be amended to reflect the merging of charges at sentencing. We affirm and remand.

¶ 2                                                                FACTS

¶ 3          The State charged defendant with attempted first degree murder (720 ILCS 5/8-4(a), 9-

1(a)(1) (West 2012)) and aggravated battery (*id.* § 12-3.05(e)(1)), alleging defendant shot Jeremy

Wade in the face, causing great bodily harm. The State also charged defendant with home

invasion (*id.* § 19-6(a)(2)) and residential burglary (*id.* § 19-3(a)). The circuit court granted

defendant's motion to sever the charges.

¶ 4                                                   I. Home Invasion Trial

¶ 5          A jury trial on the home invasion charge commenced on March 3, 2015. Virginia

Sommerville testified that she lived alone at 1601 West Jackson Street, in Ottawa, on August 9,

2013. At the time of the incident, she was 93 years old. Virginia testified that at some point in the

middle of the night, someone tied her up and "went through" her belongings. She was later able

to untie herself and call 911. A diamond ring was all Virginia recalled being removed from the

house. Photographs of Virginia taken that night show bruising on her hands and arms, as well as

duct tape hanging from her head.

¶ 6          Patrick Hardy of the Ottawa Police Department was the first officer to arrive at the scene.

Hardy observed that Virginia was in a nightgown and had duct tape in her hair. She was holding

a black zip tie. Hardy testified that the house was in disarray. He noticed ropes tied to Virginia's

bedposts, as well as an open window with closed blinds. The open window was on the west side

of the home, facing Thornton Park. Hardy noticed footprints outside the window.

¶ 7          Wade testified that he was friends with Justin Sommerville, Virginia's grandson. Wade

noticed that Justin frequently had large amounts of cash and later learned he was receiving it

from Virginia. Wade testified that "Merch" had also noticed this. "Merch" was one of

defendant's sobriquets. Approximately a week prior to the incident, Wade told defendant that Justin was receiving the money from Virginia.

¶ 8 The night before the incident, defendant asked Wade about the money. Defendant asked if there was any more money in Virginia's house. He also asked if Virginia lived alone. Wade testified that he, defendant, and Jimmy Members were present for that conversation. The next day, Wade, defendant, and Members drove to Joliet. In Joliet, defendant bought a number of wigs from a wig store. Later, the three men went to Walmart and purchased dark clothing, a pry bar, a book bag, rope, duct tape, rubbing alcohol, zip ties, and lighter fluid. Wade testified that defendant led the other men through the store. Defendant provided the money for the purchases. Surveillance footage from Walmart was played in court, and Wade identified himself, defendant, and Members in the video.

¶ 9 The group then went to the apartment of April Capsel, in Wedron. There they waited for Britney Dorsam to arrive. Wade testified of Dorsam: "She drove [defendant] around a lot, and she stayed with [defendant]." Defendant instructed Dorsam to download a police scanner or radar application onto her cell phone. Wade installed the application, which would notify Dorsam when there were police in her vicinity. Defendant and Members later went to an area near Virginia's house, for what Wade assumed was surveillance purposes. The entire group reconvened at Capsel's apartment afterward.

¶ 10 Later that night, defendant instructed Wade to put on his dark clothing. Wade, defendant, and Members gathered the items they had purchased from Walmart. Dorsam drove them to Thornton Park, which was adjacent to Virginia's house. Wade testified that he, defendant, and Members exited the car, ran through the park, and approached Virginia's house.

3

¶ 11    Wade helped defendant enter the house through an unlocked window. Defendant ran to the front door and let Members in the house. Wade testified that he heard Virginia "in there like yelping for a minute or so." He saw Members ransacking the house. Wade testified that he did not enter the house because he believed Virginia would recognize him. Members threw some bags out of the open window, and Wade collected them. Defendant and Members then exited the house through the front door. The three men ran back through the park where Dorsam picked them up. Dorsam drove them back to Capsel's apartment. Wade estimated that defendant and Members were inside Virginia's house for approximately 45 minutes to an hour.

¶ 12    At the apartment, Wade asked defendant if Wade "was going to get something out of it." Defendant gave Wade a ring. After defendant and Members left the apartment, Wade gave the ring to Capsel in exchange for drugs and as rent payment.

¶ 13    Dorsam testified that she was living with defendant during the events in question. Her testimony generally corroborated the testimony provided by Wade regarding the events taking place before and after the incident. She also testified that she and defendant left Capsel's apartment together after the incident. On the way home, she pulled over and defendant used lighter fluid to burn the dark clothing worn during the incident.

¶ 14    Ottawa police corporal Kyle Booras testified that on August 15, 2013, Capsel came to the Ottawa Police Department for reasons unrelated to the incident in question. While speaking to Capsel, Corporal Booras noticed she was wearing a ring similar to one that had been reported stolen from Virginia's house. After asking Capsel about the ring, Booras retrieved the ring and stored it in evidence. Virginia later identified the ring as the one that had been stolen from her house.

4

¶ 15    Forensic scientist Jaime Bartolotta performed DNA testing on the black zip tie recovered from Virginia's house. The DNA from the zip tie was a mixture of profiles from two different individuals. She concluded defendant could not be excluded from that DNA mixture. Approximately one in five billion black individuals could not be excluded.

¶ 16    On March 6, 2015, the jury found defendant guilty of home invasion and residential burglary. It also found he had committed the home invasion against a person 60 years of age or older.

¶ 17                                    II. Attempted First Degree Murder Trial

¶ 18    On April 23, 2015, defendant indicated he wished to proceed via bench trial on the attempted first degree murder charge and filed a jury waiver. Judge Cynthia Raccuglia, who had presided over defendant's jury trial, indicated that by waiving his right to a jury trial defendant was agreeing to a bench trial in front of her. Defendant agreed, and the court accepted his waiver.

¶ 19    The same day, the circuit court addressed a motion to include evidence of other crimes filed by the State. The State requested it be allowed to introduce evidence of the home invasion in trying defendant for the subsequent attempted murder of Wade. The court responded:

"THE COURT: The issue we have here is I'm obviously well aware of everything.

[THE STATE]: Right.

THE COURT: And I'm going to be the finder of fact.

[THE STATE]: Right.

THE COURT: And the question is what I'm to consider in making my decision. I'm clearly able to—there's no question after all these years I'm clearly able not to consider relevant what I shouldn't consider relevant ***."

5

Defense counsel argued that while the home invasion evidence would go to motive, motive was not an element the State was obligated to prove. He argued the evidence was highly prejudicial. The court ultimately granted the State's motion, commenting: "Now, with a jury, sure. They don't understand the law, and motive to them may mean he did it, but this Court knows the law and *** we all have motive to want to do harm to people that do wrong to us. That doesn't mean that we're there and we kill them ***."

¶ 20      Defendant's bench trial commenced on May 5, 2015. The first 30 pages of Wade's trial testimony consisted of his detailing the planning and execution of the home invasion. This testimony was largely identical to his testimony at defendant's home invasion trial. The State once again played the surveillance footage from the Joliet Walmart. Two Ottawa police officers also testified solely regarding the details of the home invasion.

¶ 21      Wade testified that he was taken into custody following a drug raid at Capsel's apartment on August 15, 2013. He was questioned about the home invasion but did not cooperate and was eventually released. Immediately after Wade's release, defendant contacted him wanting to know what Wade disclosed to the police. The two men arranged to meet at Jane's Pub, but when Wade arrived at that location, only Dorsam was present. Dorsam checked Wade for a wire, then arranged for Wade and defendant to speak on the phone. Wade told defendant the police did not know anything about the home invasion.

¶ 22      On the evening of August 18, 2013, Wade was with his friend, Bobby Harden. At approximately 8 p.m., Harden received a phone call and told Wade defendant wanted to speak with him. Wade spoke with defendant, who again asked Wade about his interaction with the police three days earlier. Wade told him for the first time that the police had shown him a photograph of Members. Wade testified that defendant "kind of freaked out and called an F'ing

6

idiot." Harden took the phone back from Wade. After Harden apparently spoke to defendant on the phone, Harden told Wade that defendant wanted to meet to talk.

¶ 23        Wade testified that he and Harden remained in Harden's truck, waiting for defendant. When a red car passed them, they followed it. Wade testified that the red car led them to the Streator area. Wade noticed there were two people in the car, defendant and Dorsam. Both vehicles stopped on a bridge, and Wade and defendant each alighted from their respective vehicles. Wade observed a rubber glove on defendant's hand. Defendant instructed Wade to stand against the railing and then told Harden to leave. At defendant's direction, Wade took his shirt off so defendant could check for a wire. Defendant had a plastic bag around his other hand and was holding a firearm in it. He told Wade to open his mouth. Wade testified: "I refused to open my mouth, and he kind of like grinned and giggled at me a little bit and said something about don't cry."

¶ 24        Wade recalled seeing a white flash. His next memory was of waking up in the water underneath the bridge. He had pain in his face and pelvis. He heard tires squealing and believed defendant had left. Wade thought his pelvis was broken and described his teeth as "dangling by threads of my gum line." Wade walked to a house where he could see lights. He yelled for help. He entered the house and called 911. Wade testified that he eventually received surgery on his mouth and had his pelvis reset.

¶ 25        The State played two 911 calls made by Wade in court.[1] In the first call, Wade immediately tells the operator "I just got shot in the face." When the operator asks where the firearm was, Wade replied, "he's got it." When the operator asked who had the firearm, Wade replied, "his name is Merch. *** He shot me in the face." In the second 911 call, the operator

---

[1]Wade explained that he called 911 a second time after he hung up on the first call.

7

asked Wade who shot him. Wade replied: "His nickname is Merch. M-E-R-C-H. *** He shot me on the bridge and I fell off the bridge in the water. I made my way to these guys' house and they're standing here with me."

¶ 26     Carolee Robinson testified that she and her husband lived outside of Streator, approximately 200 yards from the Sandy Ford Bridge, adjacent to the Vermilion River. On August 18, 2013, Carolee was in the back room of her house when she heard "a real scary screaming man saying I've been shot in the face." Carolee went downstairs to wake her husband, Wylie. When Carolee and Wylie returned to the back room, Wade was sitting in a chair using Carolee's telephone. She noticed blood on Wade's face and mouth. Carolee testified that Wade said: "Merch did it because I know something I'm not supposed to tell."

¶ 27     Carolee also called 911, and the audio recording of that call was played in court. During the call, Carolee told the operator that Wade said someone had shot him. She relayed that Wade was shot in the face by the bridge. The operator asked Carolee to ask Wade to provide a description of who shot him. After asking Wade those questions in the background, Carolee said to the operator: "He's driving a red car and he's black."

¶ 28     Wylie testified that Wade could not talk very well because "his mouth or his teeth were shattered." Wade was on the telephone with a 911 operator but was becoming frustrated when the operator could not understand what he was saying. Wylie testified: "The only thing that he really said to me was Merch did it."

¶ 29     Randy Railey of the La Salle County Sheriff's Office was the first person to arrive at the Robinson's house. Railey observed a bullet hole through Wade's upper lip. Wade was also shirtless and complaining of pain in his hip. Wade told Railey that Merch had shot him and

Merch was "trying to eliminate him." Wade told Railey that Merch had been driven to the bridge by Dorsam, pulled a firearm out of a bag, and shot him in the face.

¶ 30    Dorsam testified to the events surrounding the home invasion, similar to the testimony she had provided at the previous trial. She testified that she learned from defendant that Capsel's apartment had been raided. Defendant instructed her to meet with Wade, check him for wires, and arrange a phone call. The conversation between defendant and Wade was held via speakerphone; Dorsam heard defendant asking Wade questions about the home invasion.

¶ 31    Dorsam testified that on the evening of August 18, 2013, defendant instructed her to drive him to the Sandman Motel in Peru. Defendant went into the motel for approximately 10 minutes, then returned to the car carrying a backpack. Dorsam then drove defendant around until they saw a truck belonging to Harden. Harden's truck began to follow them, at which point defendant instructed Dorsam to drive to the Sandy Ford Bridge.

¶ 32    Dorsam stopped on the bridge and Harden parked his truck next to the car. Dorsam testified that she saw defendant tape a plastic bag to his hand. Defendant and Wade walked 50 to 75 feet behind the car. Dorsam then heard a loud popping sound and a splash. Defendant returned to the car and ordered Dorsam to drive away. Defendant later told her to pull over, at which point he used lighter fluid to burn the clothes he was wearing, as well as the backpack. Harden also testified, corroborating the testimony provided by Wade and Dorsam.

¶ 33    Defendant denied shooting Wade. He speculated that Wade and Dorsam were accusing him of the shooting to secure favorable deals from the State. On cross and redirect examination, defendant denied any involvement in the home invasion.

¶ 34    The circuit court found defendant guilty of attempted murder and aggravated battery. The court also found defendant's actions were the proximate cause of great bodily harm.

9

¶ 35    A presentence investigation report showed defendant had six prior felony convictions. These included multiple convictions for aggravated battery and one for disarming a peace officer. In a letter written to the court, defendant maintained his innocence for home invasion and attempted first degree murder. In his statement of allocution, defendant referred to the proceedings as a "modern-day lynching, castration, beheading in relation to due process of law." He blamed the unfair proceedings on "shape-shifting humanoids," Satan, "energy vampires among the political elite," and "the Children of the Greys."

¶ 36    The circuit court noted defendant had no remorse and found he was a danger to the public. The court sentenced defendant to a term of 45 years' imprisonment for home invasion. For attempted first degree murder, the court sentenced defendant to a concurrent term of 30 years' imprisonment. The court added a firearm enhancement of natural life in prison to the attempted murder sentence. The court ordered that the findings of guilt on residential burglary and aggravated battery would merge with the convictions for home invasion and attempted murder, respectively.

¶ 37                                    ANALYSIS

¶ 38    On appeal, defendant argues that (1) an excessive amount of evidence of the home invasion was introduced at his attempted murder trial, (2) the mandatory 25-years-to-life firearm enhancement is unconstitutionally vague, (3) the sentences imposed by the circuit court were excessive, and (4) the mittimus should be amended to reflect the merging of charges at sentencing. We address each argument in turn.

¶ 39                            I. Other-Crimes Evidence

¶ 40    Defendant first contends that an excessive amount of other-crimes evidence was introduced at his attempted first degree murder bench trial. Specifically, he maintains that the

10

evidence regarding the home invasion created a home invasion trial within the attempted murder trial. While defendant concedes that evidence of the home invasion was generally admissible to prove his motive for shooting Wade, he argues the amount and detail of that evidence rendered his trial unfair.

¶ 41    All relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice. Ill. Rs. Evid. 402, 403 (eff. Jan. 1, 2011). The probative value of a piece of evidence refers to its tendency to prove or disprove that a defendant committed the charged offense. See *People v. Maya*, 2017 IL App (3d) 150079, ¶ 68. Unfair or undue prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

¶ 42    Evidence of other crimes, wrongs, or bad acts is not admissible for the purpose of demonstrating a defendant's propensity to commit a crime. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Such evidence is generally inadmissible because it carries an extreme risk of prejudice in that it can lead to "the jury convicting a defendant because he or she is a bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170; see also *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980) (noting that other-crimes evidence tends to "overpersuade[ ] the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment"). As the United States Supreme Court has explained: "The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475-76 (1948).

11

¶ 43        Other-crimes evidence is admissible, however, for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). When introduced for such purposes, other-crimes evidence is directly probative of a defendant's guilt of the charged offense, rather than merely his character. Still, while the evidence can be admissible, it remains subject to the overarching rule that its probative value must not be substantially outweighed by the risk of undue prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Robinson*, 167 Ill. 2d 53, 63 (1995) ("Even where relevant for a permissible purpose, the trial judge must weigh the prejudicial effect of admitting the other-crimes evidence against its probative value.").

¶ 44        In addressing the danger of undue prejudice in the context of otherwise admissible other-crimes evidence, courts have consistently found that the amount and accumulation of such evidence will increase that danger. As this court has explained: "as the probative value of each subsequent piece of cumulative evidence diminishes, the prejudicial effect, if there is any, remains the same, increasing the chances that the danger of undue prejudice will come to outweigh the probative value." *Maya*, 2017 IL App (3d) 150079, ¶ 70. Thus, reviewing courts have instructed that "[w]hen weighing the prejudicial effect of admission, a court should consider whether the other-crimes evidence will become the focus of the trial, or whether it might otherwise be misleading or confusing to the jury." *People v. Perez*, 2012 IL App (2d) 100865, ¶ 47. Further, "[c]ourts have warned against the dangers of putting on a 'trial within a trial,' with detail and repetition greatly exceeding what is necessary to establish the particular purpose for the evidence." *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006) (quoting *People v. Bartall*, 98 Ill. 2d 294, 315 (1983)).

¶ 45　　　　In the present case, the evidence defendant committed the home invasion with Wade was unquestionably probative of defendant's motive and intent to shoot Wade. Indeed, defendant concedes on appeal the evidence was generally admissible for purposes other than propensity. We therefore must only consider whether the amount and detailed nature of that home invasion evidence was such that the danger of unfair or undue prejudice substantially outweighed its probative value.

¶ 46　　　　Initially, we note the evidence of defendant's commission of the home invasion had significant probative value. It demonstrated a clear motive for defendant to attempt to murder Wade, out of fear that his accomplice would implicate him in the home invasion. Moreover, it demonstrated defendant's intent to kill Wade, an element the State was burdened with proving beyond a reasonable doubt. See 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012). We also note the evidence presented by the State regarding the home invasion was highly detailed, featuring the testimony of Wade and Dorsam, testimony from authorities who investigated that offense, and video evidence. In short, the evidence was akin to what one would expect to see in an actual home invasion trial.

¶ 47　　　　The risk of undue prejudice normally accompanying the admission of large amounts of other-crimes evidence is significantly diminished where the trier of fact is not a jury but a judge. See *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24. The prejudicial effect of other-crimes evidence is almost exclusively discussed in terms of impact on a *jury*. See *Michelson*, 335 U.S. at 475-76; *Donoho*, 204 Ill. 2d at 170; *Lindgren*, 79 Ill. 2d at 137. Relatedly, the concern of an overaccumulation of admissible other-crimes evidence is it could lead to confusing or misleading the jury. *Perez*, 2012 IL App (2d) 100865, ¶ 47.

¶ 48    Unlike a jury, a trial judge is presumed to know the law and to apply it correctly. *People v. Phillips*, 392 Ill. App. 3d 243, 265 (2009). In this context then, it is presumed the trial judge considered the evidence of other crimes only for its proper, limited purpose. *People v. Deenadayalu*, 331 Ill. App. 3d 442, 450 (2002). The law thus presumes that a judge, unlike a jury, is not likely to find a defendant guilty simply because he or she is a bad person deserving punishment. See *Donoho*, 204 Ill. 2d at 170. Similarly, the admission of large or detailed amounts of other-crimes evidence that is properly admissible is not likely to mislead or confuse a trial judge. The law presumes that that evidence is not likely to "lure the [judge] into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180.

¶ 49    The logic surrounding a rebuttable presumption that the trial judge knows and correctly applies the law is demonstrated by this case.[2] When ruling on the State's motion to introduce evidence of other crimes, the trial judge correctly noted the law holding that the consideration of other crimes evidence for improper purposes by a jury is a great concern. After recognizing this legal proposition, the judge commented that she, however, was "clearly able not to consider relevant what I shouldn't consider relevant." She also explicitly stated that evidence of motive is not directly evidence of guilt.

¶ 50    Moreover, it is relevant that the trial judge in defendant's attempted murder bench trial also presided over his home invasion jury trial. This judge, of course, had already heard all of the State's evidence relating to the home invasion. We would be remiss if we did not point out that,

---

[2]Defendant argues that where the circuit court explicitly allows a motion to admit certain evidence, it must also be presumed to have considered that evidence. While defendant is surely correct, it is irrelevant to the case before us. As discussed above, the evidence in question was admissible for the purposes of proving motive and intent. The circuit court was correct in considering that evidence in reaching its decision. Thus, while the court's act of admitting the evidence indicates that it considered that evidence, there is no indication on the record that the evidence was considered for an *improper* purpose.

optimally, the State would have tried defendant for attempted murder before a different judge. Practically speaking, this would not have been a burdensome course, as there was surely not shortage of available judges in La Salle County. Nevertheless, defendant chose to proceed with a bench trial, even knowing the bench trial would be before the same judge. There was no motion for substitution, and defendant does not raise any contentions of error on appeal relating to these circumstances.

¶ 51     Defendant apparently accepted the judge's ability to consider the home invasion evidence only for its proper purpose heading into the attempted murder trial. His argument on appeal, essentially, is that the judge's hearing that evidence for a *second* time created an unacceptable risk of undue prejudice. This position strains credulity. If anything, the trial judge's prior knowledge of the home invasion evidence would serve to soften the impact of that evidence the second time around.

¶ 52     Finally, the evidence of defendant's guilt was overwhelming. Clear and consistent first-hand testimony from Wade, Dorsam, and Harden established that defendant shot Wade. Moreover, in the immediate aftermath of the shooting, Wade told Carolee, Wylie, Railey, and 911 operators that it was defendant who had shot him. Given this evidence, it is highly unlikely the result would have been different absent the introduction of other-crimes evidence. The flip side of that coin, however, is there was absolutely no need for the State to introduce such detailed evidence regarding the home invasion. Defendant's motive for shooting Wade could have simply been established by a brief summary of the earlier events from Wade himself. Indeed, defendant would have been found guilty even if the State had produced *no* evidence of motive. While we do not find reversible error on the facts of this case, this should not be read as a general endorsement of the introduction of the massive amount of other-crimes evidence.

¶ 53     While the evidence of defendant's home invasion was of clear probative value at his attempted murder trial, that probative value continued to diminish as further detailed evidence of the home invasion was introduced. However, the risk of unfair or undue prejudice attendant to that evidence was low where the finder of fact was a judge rather than a jury and a judge who was already aware of the home invasion evidence. Accordingly, the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice, and the circuit court did not err in admitting that evidence.

¶ 54                              II. Vagueness

¶ 55     Section 8-4(c)(1)(D) of the Criminal Code of 2012 (Code) (720 ILCS 5/8-4(c)(1)(D) (West 2012)) sets forth a sentence enhancement for a defendant who discharges a firearm in committing attempted first degree murder. The statute provides:

> "an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court[.]" *Id.*

On appeal, defendant argues the statute is unconstitutionally vague because it provides the sentencing court with vast discretion to impose a sentence within a broad range of penalties without providing any factors or criteria that would guide that exercise of discretion. The State, on the other hand, urges that this court follow the rationale set forth in *People v. Butler*, 2013 IL App (1st) 120923, where the first district found an identical firearm enhancement for first degree murder was not vague.

16

¶ 56     The United States Constitution provides that "[n]o person shall *** be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. The State violates the due process clause when it deprives a person of their liberty based on a sentencing statute "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. ___, ___, 135 S. Ct. 2551, 2556 (2015). "A statute is unconstitutionally vague if the terms are so ill-defined that the ultimate decision as to its meaning rests on the opinions and whims of the trier of fact rather than any objective criteria or facts." *People v. Pembrock*, 62 Ill. 2d 317, 322 (1976).

¶ 57     If reasonably possible, a statute must be construed to be constitutional. *People v. Greco*, 204 Ill. 2d 400, 406 (2003). In the context of a vagueness challenge, a court will apply a two-pronged test. Due process is satisfied where:

> "(1) the statute's prohibitions are sufficiently definite, when measured by common understanding and practices, to give a person of ordinary intelligence fair warning as to what conduct is prohibited, and (2) the statute provides sufficiently definite standards for law enforcement officers and triers of fact that its application does not depend merely on their private conceptions." *Id.* at 416.

Defendant challenges only the second prong, conceding that the standards for imposition of the enhancement, as well as the scope of permissible sentences are clearly defined. Instead, defendant argues that the enhancement statute allows a sentencing court to impose the most severe sentence under Illinois law without providing any sufficiently definite standards guiding the court's discretion.

¶ 58     In *Butler*, the court addressed a vagueness challenge to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (Unified Code). See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012). That statute is identical to the enhancement statute in question in that it mandates an

17

enhancement of 25 years to natural life imprisonment where the defendant's discharge of a firearm proximately causes "great bodily harm, permanent disability, permanent disfigurement, or death to another person." *Id.* That statute, however, applies to the commission of first degree murder, rather than attempted first degree murder. *Id.*

¶ 59   The *Butler* court conceded "that the 25-years-to-life sentence enhancement lacks detailed instruction as to where a trial court's sentence should fall within the broad range of the statute." *Butler*, 2013 IL App (1st) 120923, ¶ 42. However, the *Butler* court held that the statute was not vague after being persuaded the "sliding scale" of injuries triggering the statute also correspond to the severity of the enhancement. *Id.* ¶¶ 37, 41. Specifically, the *Butler* court concluded:

> "Depending on the injury caused by the firearm used by the defendant, the trial court has discretion to impose a sentence in the range of 25-years-to-life. This allows the trial court to engage in fact-based determinations based on the unique circumstances of each case. The wide range of the sentence enhancement is appropriate because it is impossible to predict every type of situation that may fall under the purview of the statute. By defining the types of injuries that trigger the sentence enhancement, the legislature has provided the trier of fact with guidelines to apply when determining what sentence to impose within the boundaries of the statute." *Id.* ¶ 41.

¶ 60   We agree with the reasoning set forth by the court in *Butler* and believe it to be applicable to section 8-4(c)(1)(D). By tying the 25-years-to-life enhancement to the nature of the injuries caused, the legislature made clear its intent that the length of the enhancement should be based upon those injuries. In our view, the "sliding scale" referenced by the *Butler* court does not

18

represent a rigid formula for imposing an enhanced 25-years-to-life sentence that *directly corresponds* to great bodily harm, permanent disability, permanent disfigurement, or death.

¶ 61 Rather, *Butler* stands for the proposition that, once invoked, the statute provides a clearly defined scope and standard for the circuit court to exercise its discretion in considering the unique circumstances of each particular case, making fact-based determinations, and imposing a mandatory sentence enhancement based upon the injuries proximately caused by the defendant. See *id.* For our purposes, this approach reflects how "great bodily harm" occurs in various degrees. *E.g.*, *People v. Arbuckle*, 2016 IL App (3d) 121014-B, ¶ 42 ("Great bodily harm, on the other hand, can certainly exist in varying degrees. There is great bodily harm and then there is great bodily harm."). We are of the opinion that this discretionary approach is consistent with the process that the trial courts of this state are accustomed to employing when imposing sentences.

¶ 62 Defendant is correct that section 8-4(c)(1)(D) of the Code does not *explicitly* instruct the circuit court to consider the nature of the victim's injury when crafting the enhanced sentence. However, to avoid being vague, a statute must include "sufficiently definite standards," not explicit instructions. Here, the statute states that injuries of a certain type—great bodily harm, permanent disability, permanent disfigurement, or death—*shall* trigger the enhancement. We believe, as did the court in *Butler*, the extent or degree of the enhancement turns on the extent or degree of the injuries in each case, thereby indicating a "sufficiently definite" standard. This view is consistent with our duty to construe a statute as constitutional wherever reasonably possible. *Greco*, 204 Ill. 2d at 406. Thus, we find section 8-4(c)(1)(D) of the Code is not unconstitutionally vague. The standard set forth therein is no more arbitrary, ill-conceived, whimsical, or based on private conceptions than any other discretionary sentencing statute.

19

¶ 63    In reaching this conclusion, we also reject defendant's contention that our construction of the enhancement runs afoul of the general bar on double-enhancements. Our supreme court has made clear that the so-called rule barring double enhancements is actually a tenet of statutory construction "based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *People v. Phelps*, 211 Ill. 2d 1, 12 (2004). As a result, "where the legislature clearly intends to enhance the penalty based upon some aspect of the crime, and such an intention is clearly expressed, there is no prohibition." *Id.* at 15. In this case, of course, the double enhancement is not in the nature of a factor inherent in the offense but in the double counting of a single aggravating factor. See, *e.g.*, *People v. Del Percio*, 105 Ill. 2d 372, 376-78 (1985). Defendant's contention is that a single factor, the degree of great bodily harm, should not be used as a basis for the base sentence for attempted murder and again as a basis for the firearm enhancement.

¶ 64    We reject defendant's argument because the legislature *has* expressed an intent for those same factors to enhance sentences for both the base crime of attempted murder and the enhancement found in section 8-4(c)(1)(D). Namely, our supreme court determined it was the serious problem of firearm use that prompted the legislature to impose sentencing enhancements of 25-years-to-life for discharging a firearm during a serious felony, causing great harm. *People v. Sharpe*, 216 Ill. 2d 481, 531 (2005). "The legislature clearly spelled out its intent in enacting the firearm enhancements in a codified statement of legislative intent," where public health, safety, and welfare caused by firearms during felony offenses are cited as justification. *Id.* (citing 720 ILCS 5/33A-1(a), (b) (West 2000)).

¶ 65    Based on this intent, the legislature enacted section 8-4(c)(1)(D), despite the continuing effectiveness of section 5-5-3.2(a)(1) of the Unified Code, which mandates that courts consider

20

the infliction of serious harm in fashioning a sentence. See 730 ILCS 5/5-5-3.2(a)(1) (West 2012)). It is not our function to overrule the legislature where double enhancement based upon the same aggravating factors has been deemed appropriate. *Sharpe*, 216 Ill. 2d at 530; see also *Butler*, 2013 IL App (1st) 120923, ¶ 43.

¶ 66                                    III. Excessive Sentence

¶ 67        Next, defendant argues his consecutive sentences of 45 years' imprisonment for home invasion and natural life imprisonment for attempted first degree murder were excessive. He does not contend the circuit court improperly considered any factor in aggravation nor does he argue the court failed to consider a certain factor in mitigation. His argument, more simply, is that the sentences imposed were not proportional to the seriousness of the offenses when the factors inherent in those offenses is considered.

¶ 68        The circuit court has broad discretion in imposing a sentence, and a reviewing court will give great deference to that judgment. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). A sentence within the prescribed statutory range will not be disturbed on appeal absent an abuse of discretion. *Id.* at 212. Similarly, it is inappropriate for a reviewing court to reweigh the factors involved in a sentencing decision. *Id.* at 214. A sentence will be deemed an abuse of discretion where the sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 69        Home invasion is a Class X felony subject to a sentencing range between 6 and 30 years' imprisonment. 720 ILCS 5/19-6(a)(2) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). However, because the victim of the home invasion was over 60 years of age, defendant was eligible for an extended-term Class X sentence of between 30 and 60 years' imprisonment. 730 ILCS 5/5-5-3.2(b)(3)(ii), 5-4.5-25(a) (West 2012).

21

¶ 70    Defendant insists the home invasion committed by defendant "is essentially no worse than that which is inherent in the offense of home invasion." Yet Virginia Sommerville was 93 years old when defendant invaded her home. Our legislature has determined that offenses committed against elderly persons are subject to harsher punishment. *Id.* § 5-4.5-25(a). The circuit court was plainly within its discretion to sentence defendant in the extended range.

¶ 71    It is true defendant's commission of home invasion did not involve any harm *beyond* that inherent in the offense. However, defendant did have six prior felony convictions on his record, including multiple convictions for aggravated battery. Given defendant's record and the victim's extremely advanced age, a sentence at the precise midpoint of the extended range (45 years) cannot be deemed manifestly disproportionate to the nature of the offense.

¶ 72    Attempted first degree murder is a Class X felony subject to a sentencing range between 6 and 30 years' imprisonment. 720 ILCS 5/8-4(c)(1) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). Moreover, as discussed above, defendant was subject to an enhancement of 25 years to natural life because he caused great bodily harm to Wade through the personal discharge of a firearm. 720 ILCS 5/8-4(c)(1)(D) (West 2012).

¶ 73    Defendant again argues that "[t]he great bulk of [defendant]'s conduct was inherent in the offense." This argument, however, ignores the factors in aggravation. Most notably, defendant shot Wade in the face in a calculated attempt to prevent Wade from implicating him in the home invasion. Defendant was attempting to murder a potential witness against him. Moreover, Wade's testimony that defendant "grinned and giggled" at him and told him not to cry before shooting him in the face, indicated particularly wanton cruelty. In addition to those facts and defendant's moderate criminal record, defendant showed no remorse at sentencing, instead using his allocution to deliver a diatribe on the purported unfairness of the proceedings. While

22

defendant urges us to consider that "Wade was not shot repeatedly or tortured" and he had previously been extremely polite in court before he "los[t] his composure" at sentencing, it is not this court's role to reweigh the sentencing factors. Defendant's base sentence for attempted first degree murder (30 years) was not manifestly disproportionate to the nature of the offense.

¶ 74    We also find the sentencing enhancement of natural life in prison is not excessive given the grievous nature of Wade's injuries. See *supra* ¶¶ 60-61. Wade did not suffer from an ordinary gunshot wound in this case; rather, he was shot at close range in his face. The damage was not even limited to the gunshot wound, as defendant's act of discharging the firearm also caused additional injuries when Wade fell from the bridge.

¶ 75    This conclusion is bolstered by a commonsense assessment of the sentencing enhancement in this case, which demonstrates the minimal impact it had on defendant's ultimate aggregate sentence. Defendant's consecutive base sentences for home invasion and attempted murder result in 75 years of imprisonment. Even if defendant were to receive the maximum allowable good-time credit of 4.5 days for each month served (730 ILCS 5/3-6-3(a)(2)(ii)-(iii) (West 2014)), defendant would be obligated to serve 65 years in prison. Defendant would be 98 years old when his base sentences expired. Even the minimum firearm enhancement would result in defendant being imprisoned—again assuming maximum good-time credit—until he was 120 years old. In this factual context, the actual difference between the minimum firearm enhancement (25 years) and the maximum (natural life) is insignificant.

¶ 76    Accordingly, we affirm defendant's base sentences of 45 years' imprisonment for home invasion and 30 years' imprisonment for attempted first degree murder enhanced to natural life imprisonment.

23

¶ 77                                   IV. Amendment of Mittimus

¶ 78          Finally, defendant argues that his mittimus must be amended to reflect the merger of his residential burglary and aggravated battery charges.

¶ 79          At sentencing, the court explicitly stated that those charges would merge with defendant's convictions for home invasion and attempted first degree murder. While the written sentencing order lists all four charges, it only lists sentences next to home invasion and attempted murder. Adjacent to both residential burglary and aggravated battery, the sentencing order states "[s]entence merges." The order, however, does list terms of mandatory supervised release (MSR) for the merged counts, terms of three years and two years of MSR for aggravated battery and residential burglary, respectively.

¶ 80          The Illinois Department of Corrections (DOC) website, of which this court may take judicial notice, shows defendant as presently serving four sentences. The website indicates defendant is serving a term of three years' imprisonment for aggravated battery and two years' imprisonment for residential burglary. We surmise the DOC has interpreted the MSR terms found on the sentencing order as convictions with attendant sentences. We therefore remand the matter to the circuit court with instructions that it issue an amended mittimus making clear that defendant has not been convicted of aggravated battery or residential burglary.

¶ 81                                            CONCLUSION

¶ 82          The judgment of the circuit court of La Salle County is affirmed with respect to defendant's convictions and sentences. However, we remand with directions that the circuit court issue an amended mittimus.

¶ 83          Affirmed.

¶ 84          Remanded with directions.

24

¶ 85       JUSTICE McDADE, concurring in part and dissenting in part.

¶ 86       I concur in the majority's judgment with respect to sections I and IV of the lead opinion. I also concur in the result with respect to section III, as I would also find that defendant's base sentences were not excessive. However, I would find that the section 8-4(c)(1)(D) firearm enhancement is unconstitutionally vague and would vacate defendant's sentence enhancement of natural life in prison. For that reason, I respectfully dissent.

¶ 87       Section 8-4(c)(1)(D) of the Code provides a sentencing enhancement of between 25 years' imprisonment and natural life imprisonment. 720 ILCS 5/8-4(c)(1)(D) (West 2012). It states, explicitly, that such enhancement shall be applied to any person who, in an attempt to commit first degree murder, personally discharges a firearm and thereby causes "great bodily harm, permanent disability, permanent disfigurement, or death to another person." *Id.*

¶ 88       While the enhancement statute clearly indicates when and to whom it applies, it does not explicitly provide *any* standards or criteria that might guide the sentencing court in fashioning a sentence within the broad range of 25 years to life. The enhancement statute is "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at ___, 135 S. Ct. at 2556. Without definite standards guiding the sentencing court's discretion, that court may sentence a defendant to a term of natural life imprisonment based solely on the judge's whims and private conceptions. See *Greco*, 204 Ill. 2d at 416.

¶ 89       The majority, like the *Butler* court, assumes with no apparent justification that the sliding scale of injuries—great bodily harm, permanent disability, permanent disfigurement—used to *trigger* the enhancement, must also be used to fashion the enhancement. The enhancement statute itself provides no suggestion, either explicit or implicit, that those injuries are intended to guide the sentencing court's discretion. Indeed, such a construction is one of purely judicial

25

creation. Furthermore, the notion that this list of potential injuries is a "sliding scale" (*Butler*, 2013 IL App (1st) 120923, ¶ 37) or spectrum of harms finds no support in case law or in common sense. "Permanent disfigurement" is not clearly more severe or more offensive than "permanent disability." It is likewise unclear why "great bodily harm" should be considered inherently less severe than both of those. It does not rationally follow from the enhancement statute that a defendant who causes permanent disfigurement should be sentenced more severely than one who "merely" causes great bodily harm. While our supreme court has instructed that a statute should be construed as constitutional "[i]f reasonably possible" (*Greco*, 204 Ill. 2d at 406), such a strained interpretation of the enhancement statute here is simply not reasonable.

¶ 90        Further, the majority asserts that "[t]he standard set forth [in section 8-4(c)(1)(D)] is no more arbitrary, ill-conceived, whimsical, or based on private conceptions than any other discretionary sentencing statute." *Supra* ¶ 62. But this is demonstrably false. In fact, the legislature has enacted statutes detailing *numerous* factors that a court should consider in crafting a sentence. 730 ILCS 5/5-5-3.2 (West 2012) (factors in aggravation); *id.* § 5-5-3.1 (factors in mitigation). The nearly 40 sentencing factors enumerated in those two sections alone apply to every discretionary sentence and actually serve to illustrate the utter lack of guidance provided by section 8-4(c)(1)(D) of the Code.

¶ 91        In fact, the dearth of sentencing guidance found in section 8-4(c)(1)(D) increases the potential that a sentencing court would resort to those statutory lists of aggravating and mitigating factors in fashioning the enhancement. Presuming those factors were already considered when the court imposed the base sentence, such a tact would constitute an improper double enhancement. *Sharpe*, 216 Ill. 2d at 530. Of course, as the majority points out, a double enhancement is allowable where the legislature expressly provides for one. Thus, the legislature

26

would be free to enact legislation dictating that the section 8-4(c)(1)(D) enhancement should be based upon the standard factors in aggravation and mitigation. Even the *Butler* court conceded that "confusion could be avoided if the legislature provided more explicit guidance regarding the imposition of the 25-years-to-life sentence enhancement." *Butler*, 2013 IL App (1st) 120923, ¶ 42. Until such time as the legislature does take some step to clarify exactly what the enhancement should be based upon, however, section 8-4(c)(1)(D) is unconstitutionally vague.