**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220034-U

Order filed June 26, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0034 Circuit No. 20-CF-686 |
| | ) | |
| LUIS P. CASTILLO, | ) ) | Honorable Ann Celine O'Hallaren Walsh, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Justices Hettel and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1        *Held*:   Neither the introduction of evidence of defendant's postarrest conduct, nor the State's questioning of defendant regarding the credibility of the other witnesses constituted plain error.

¶ 2        Defendant, Luis P. Castillo, appeals from his convictions for aggravated assault on a peace officer and resisting a peace officer. Defendant argues that the State's introduction of other-crimes evidence and questioning defendant about the credibility of other witnesses constituted plain error. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4          On March 30, 2020, the State charged defendant with aggravated assault on a peace officer
(720 ILCS 5/12-2(b)(4.1)(i) (West 2020)) and resisting a peace officer (*id.* § 31-1(a)). Count I
alleged that "defendant, without lawful authority, knowingly engaged in conduct which placed
Officer Abigail Lauer, a peace officer performing her official duties, in reasonable apprehension
of receiving a battery, in that said defendant approached *** Lauer with his hands raised in the air
while holding a glass bottle." Count II alleged that defendant:

> "knowingly resisted the performance of Ofc. E. Gouty *** of an authorized act
> within his official capacity, being the arrest of [defendant], knowing [Gouty], to be
> a peace officer engaged in the execution of his official duties, in that he tightened
> and flexed his arms and refused to put his hands behind his back to be handcuffed,
> and he refused to walk to the patrol vehicle and had to be carried."

Counsel was appointed to represent defendant. The case proceeded to a bench trial on October 21,
2021.

¶ 5          Officer Eric Gouty of the Lombard Police Department testified that on March 29, 2020,
just before midnight, he was dispatched to a residence on South Highland Avenue due to a report
of a domestic disturbance in progress. Gouty was the first officer to arrive. Other officers, including
Officer Lauer, also responded to the scene. The officers were all wearing police uniforms and in
marked patrol vehicles. Upon his arrival, Gouty encountered defendant near the front door of the
residence. Defendant invited officers into the residence. Other occupants included defendant's
sister, Jessica Castillo; her friend, Liliana Flores; defendant's girlfriend, Brittany Ponton; and
defendant's roommate, Tylor Martin. There was a child sleeping on the second floor of the
residence.

2

¶ 6        Gouty testified that defendant had "a very agitated and angry demeanor" and appeared to be intoxicated. Defendant spoke loudly to Gouty and yelled at Jessica, who was sitting on his couch. Numerous open glass beer bottles were spread throughout the front room and kitchen of defendant's residence. Defendant explained to Gouty why he had called the police to the residence, ordered Gouty to remove Jessica and Flores from his residence, and yelled at Gouty to "[d]o [his] job." Gouty attempted to interview Jessica and Flores inside the home but moved the conversation outside due to defendant's continued belligerence and yelling. Officers determined that it would be best if Jessica and Flores left the residence. Defendant continued to yell from inside the residence before walking to the front door. Officers prevented defendant from exiting the residence.

¶ 7        Gouty further testified that he and other officers accompanied Jessica and Flores inside the house to gather their belongings and the sleeping child so they could depart. Defendant was inside the residence, still agitated and yelling. He held a glass beer bottle in his hand. Gouty explained to defendant what was happening and that the women would be gathering their belongings. The officers requested defendant's information. Defendant refused to identify himself. An officer located defendant's identification card (ID) on a countertop and ran his information. This action caused defendant to become irate. Defendant yelled at officers to vacate his residence and threatened to sue officers for touching his property. Attempts to calm defendant were unsuccessful, and he began to make derogatory and insulting comments, specifically directed toward the female officers. Gouty provided numerous explicit examples of defendant's comments. Defendant made comments about Lauer being "a dumb blond that can't read or write."

¶ 8        Gouty went on to state that officers helped Jessica and Flores safely leave the residence. Ponton indicated to officers that she would also like to leave. Gouty testified that, as officers stood

3

outside the residence speaking with Ponton, defendant approached the front door and slammed it shut. Seconds later, defendant opened the door "in a very fast and aggressive motion." He had a beer bottle in his hand and began yelling at officers to "[g]et the fuck off [his] property" and referred to them as "pigs." Gouty indicated that Lauer was the closest officer to the door, and she was much smaller than defendant.

¶ 9 He further testified that at this point, Lauer illuminated defendant with her flashlight and told him to stay inside the residence. Gouty informed defendant that they had almost completed their investigation and would be leaving shortly. Defendant remained agitated. He flung the door open in "a very aggressive manner" and walked "very aggressively and fast" toward Lauer. Defendant made a sweeping motion with his hands while yelling "[g]et off my property, go" and raised the beer bottle over his head. Gouty indicated that based on defendant's agitated demeanor, threatening comments, and hostile attitude, he feared for Lauer's safety and believed defendant was going to strike her with the beer bottle.

¶ 10 Gouty moved to intercept defendant and struck him in the chest with a defensive maneuver which caused defendant to lose his balance and his grip on the beer bottle. Defendant fell to the ground on top of the bottle. Gouty testified that he immediately "kneeled down on [defendant's] side" and attempted to place him under arrest. Defendant did not place his hands behind his back. Instead, he attempted to push himself up. Gouty rolled defendant fully onto his stomach and attempted to gain control of his arms to handcuff him. Defendant ignored commands to place his hands behind his back and continued to try and push himself up. Another officer moved to help Gouty. Defendant flexed and tightened his arms, pulling away from Gouty's grip. Eventually, the two officers were able to gain control, and Lauer stepped in and handcuffed defendant. Defendant

4

continued to yell and swear at officers and refused to walk to the squad car. Gouty had to physically lift defendant and carry him to the squad car.

¶ 11 Defendant was transported to the police station. Gouty continued to interact with defendant throughout the booking process. Defense counsel repeatedly objected to the admission of defendant's postarrest behavior arguing that the evidence was irrelevant. The State informed the court that it sought the admission of the evidence to demonstrate defendant's demeanor. The court allowed the State to question Gouty about defendant's postarrest behavior. Defendant was "completely uncooperative, belligerent, loud, [and] profane" throughout the booking process. Gouty testified to numerous profane and insulting statements and threats defendant made during that period. Defendant refused to comply with the booking process and was transferred to jail and later returned to the station. Upon his return, defendant complained to Gouty about difficulty breathing and pain in his right hand. Defendant requested medical treatment and was transported to the hospital. Gouty followed defendant to the hospital. Defendant was treated and released. Gouty transported defendant to the jail. During the drive, defendant "continued to be agitated and loud, yelling numerous insults and crude comments towards [Gouty]."

¶ 12 On cross-examination, Gouty testified that when defendant exited the front door of his residence with the beer bottle, he walked from the residence and did not run. He extended his arms and made a sweeping motion with them. Defendant was holding the beer bottle by the base as an individual would if they were drinking from the bottle.

¶ 13 Lauer's testimony was consistent with the account provided by Gouty. She testified that upon her arrival, defendant was agitated but did not start yelling at officers and attempting to eject them from his residence until officers began inspecting defendant's ID. After the officers exited the residence, Lauer indicated that as defendant was in the doorway yelling at them, she

5

illuminated him with her flashlight for officer safety. Lauer testified that when defendant exited the residence and began walking aggressively toward her, swinging his arms, and holding his beer bottle above his head, she felt threatened and believed defendant was going to harm her. Defendant held the beer bottle by the base in one hand. He was gesturing with both hands as he approached her. Lauer stepped back and Gouty moved to stop defendant's advance. Lauer assisted in handcuffing defendant. Defendant went limp as the officers stood him up; however, Lauer testified that he was conscious and speaking while officers carried him to the squad car. Further, Lauer testified that she helped transport defendant to the jail on the first occasion and described his demeanor as very agitated and angry. She detailed a few racially insulting comments made by defendant to a Hispanic officer. After the officers testified, the State admitted a photograph of the outside of defendant's residence and then rested.

¶ 14        Defendant testified that on March 29, 2020, he called police to his residence to have his sister removed from the premises. He indicated that his initial interaction with Gouty was pleasant. He explained to Gouty the reason for the call and invited the officers into the residence. Defendant did not impede efforts to remove Jessica and Flores from the residence. Defendant never gave officers permission to search the home. When officers were inside his home attempting to gather Jessica and Flores's belongings, defendant noticed officers looking at his personal effects, including his ID, jewelry, and other medical devices that were laid out on a table. Defendant then became "angry with [the officers] being in the house."

¶ 15        Defendant indicated that after the officers had exited, he walked out of the residence and began asking to speak to their supervisor. He was loud and shouting that he wanted the officers off his property. At that time, Lauer "grinned in [defendant's] face" and shined her flashlight on him. Defendant consumed several beers that night and probably would not have been sober enough to

6

operate a vehicle. He testified that he recalled the events of the evening despite his intoxication. Defendant admitted that he used profane language when yelling at officers to get off his property. Defendant indicated that he was gesturing and speaking with his arms. He had a beer bottle in his hand. He denied raising the bottle above his shoulder. He did not attempt to strike any officer with the bottle. Defendant stopped in front of Lauer and "[t]he last thing [he] remember[ed] *** was being lifted off the ground and Officer Gouty yelled, That's assault, motherfucker—." (R202) Defendant described being lifted and slammed to the ground. He did not recall anything after that point until he regained consciousness in the back of a squad car.

¶ 16        Defendant admitted that the officers' testimony regarding his postarrest demeanor at the police station was accurate "[t]o some extent." He explained that he had an adverse interaction with another officer at the Sheriff's department which caused him to lash out in anger. Defendant admitted to insulting and yelling at the officers and making derogatory jokes about blonde-haired women. Defendant denied making any racial slurs.

¶ 17        On cross-examination, defendant admitted to drinking for several hours prior to officers' arrival at his residence. He denied that all the beer bottles belonged to him. The State reminded defendant that the officers testified that defendant was the only person in the residence who appeared intoxicated. The State then asked "[t]hat's not accurate?" about the officers' testimony on that issue and "[t]hey were lying?" Defendant indicated that contrary to Gouty's testimony, he was not belligerent with officers upon their initial arrival. Defendant was angry with his sister. Defendant asserted that he discovered Jessica consuming cocaine in his basement which is what led to him calling the police to have her removed.

¶ 18        Defendant explained his version of events again and the State asked:

7

"Now, is it your testimony that your recollection of what happened that night is better than the officer's testimony, even though you had consumed between six and 12 beers prior to their arrival?

[DEFENDANT]: Yes.

[THE STATE]: You remember it better than they do?

[DEFENDANT]: Up to the point where I got knocked unconscious, yes, I do."

Turning to defendant's arrest, the State asked:

"Okay. You heard the officers say that you were talking and pushing yourself off the ground—

[DEFENDANT]: Correct.

[THE STATE]:—and resisting arrest during all of the time that you allege that you were unconscious, correct?

[DEFENDANT]: Correct.

[THE STATE]: So all of that is a lie?

[DEFENDANT]: I was unconscious. I can't tell you yes or no."

Defendant denied being too intoxicated to recall the night's events. Further, defendant denied making threats of violence against officers but admitted to threatening to sue them.

¶ 19    The court found defendant guilty of both charges. In its decision, the court recounted the testimony of the witnesses and indicated that it did not find defendant's version of events credible for either charge. In so finding, the court highlighted the corroborative nature of the officers' testimony and the significant number of details provided by each officer. Defendant was sentenced to 24 months' probation. Defendant appeals.

8

II. ANALYSIS

¶ 21    On appeal, defendant argues that two errors occurred during his trial: (1) the State introduced evidence of defendant's bad acts following his arrest, and (2) the State repeatedly asked defendant to comment on the credibility of the officers who had testified against him. Defendant acknowledges that he forfeited these issues but requests we review them under the plain error doctrine.

¶ 22    The plain error doctrine enables a forfeited error to be reviewed when: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant contends that his claims of error are reversible under the first prong of the plain error analysis. The first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 23                    A. Other Crimes/Bad Acts Evidence

¶ 24    First, defendant argues that the circuit court erred in admitting highly prejudicial evidence of bad acts committed by defendant following his arrest for the charged offenses. Evidence of wrongs, bad acts, or other crimes are inadmissible if it is used to demonstrate a defendant's propensity to commit crimes. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, "[s]uch evidence may *** be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Additionally, "evidence of another crime is admissible if it is part of a continuing narrative of the event giving rise to the offense or, in other words, intertwined with the offense charged." *People v. Thompson*,

359 Ill. App. 3d 947, 951 (2005). Further, " '[w]hen facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes.' " *Id.* (quoting *People v. Collette*, 217 Ill. App. 3d 465, 472 (1991)).

¶ 25        Here, evidence of defendant's continued aggressive and belligerent behavior was solicited by the State to demonstrate defendant's demeanor. The evidence immediately followed his arrest and was part of a continuing narrative. It established that defendant was transported to the police station, the jail, and the hospital at various points after his arrest. At all times, he was accompanied by officers who had been interacting with him since before his arrest. The evidence spanned the time Gouty arrived at defendant's residence until Gouty left defendant at the jail. It was not separate or distinct. Neither were defendant's postarrest actions undertaken for different reasons. Defendant began yelling and verbally abusing officers both before and after his arrest because an officer upset him. Accordingly, the admission of the evidence was not error.

¶ 26        In coming to this conclusion, we reject defendant's contention that the admitted postarrest evidence occurred over the course of several hours and did not constitute a continuing narrative as the continuing narrative exception does not apply to crimes or bad acts that are "distinct and 'undertaken for different reasons at a different place at a separate time.' " *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 68 (quoting *People v. Adkins*, 239 Ill. 2d 1, 33 (2010)). While the postarrest evidence did take place in several locations over the course of a few hours, it concerns circumstances encompassing the entire situation between defendant and officers that night. The postarrest evidence is part of the continuing narrative of the events of March 29, 2020.

¶ 27                    B. Questioning Defendant about the Credibility of Other Witnesses

¶ 28    Next, defendant argues that the State improperly questioned defendant regarding the credibility of the officers. It has repeatedly been held that it is improper to question a criminal defendant regarding his opinion on the veracity of other witnesses. See *People v. Leonard*, 391 Ill. App. 3d 926, 936 (2009); *People v. Robinson*, 219 Ill. App. 3d 235, 239 (1991). This manner of questioning intrudes on the trier of fact's function of determining the credibility of the witnesses. *People v. Mitchell*, 200 Ill. App. 3d 969, 977 (1990). Despite the impropriety of such questioning, reversible error will not occur if it can be considered harmless. *Robinson*, 219 Ill. App. 3d at 239.

¶ 29    Here, defendant was asked to comment on the veracity of the officers several times. Regarding the officers' testimony about whether anyone else in the residence appeared intoxicated, the State asked: "[t]hat's not accurate?" and "[t]hey were lying?" When questioned about the officers' testimony regarding his resisting arrest, the State asked "[s]o all of that is a lie?"

¶ 30    The State's questions were improper and not intended to merely comment on defendant's own credibility. The State repeatedly asked defendant to comment on the accuracy of the officers' testimony and accused the officers of lying under oath. However, the error resulting from this line of questioning is harmless. We note that defendant was convicted following a bench trial. The court, as the trier of fact, is presumed to know and follow the law and to have considered the evidence only for its proper, limited purpose. See *People v. Felton*, 2019 IL App (3d) 150595, ¶ 48. Nothing in the record rebuts this presumption. In its decision, the court stated that it determined the officers were credible due to the very detailed and corroborative nature of their testimony. The court's reasoning did not indicate that it considered the small number of improper questions asked by the State. Thus, it is clear from the court's statements that its credibility determination would remain the same in the absence of the State's improper questioning.

11

¶ 31 Defendant argues that we cannot presume the court's decision was unaffected by this error because the questions went directly to the issue of credibility which was the fundamental issue in this matter. However, courts are frequently called on to make credibility determinations which we must give great deference to, especially when the record contains the court's explicit findings. See *People v. Williams*, 2013 IL App (1st) 111116, ¶ 76; *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68. Here, the court indicated the reasoning for its credibility determinations, which did not include any consideration of the State's improper questions. Accordingly, no reversible error occurred.

¶ 32 For the foregoing reasons, we find the admission of defendant's postarrest behavior and the State's improper questioning regarding the credibility of other witnesses do not constitute reversible plain error. We affirm defendant's convictions for aggravated assault on a peace officer and resisting a peace officer.

¶ 33                                    III. CONCLUSION

¶ 34 The judgment of the circuit court of Du Page County is affirmed.

¶ 35 Affirmed.