2021 IL App (1st) 180499-U
No. 1-18-0499

SECOND DIVISION
August 24, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 CR 7562 |
| | ) | No. 16 CR 7563 |
| JACK ABLAHAD, | ) | No. 16 CR 7564 |
| | ) | |
| Defendant-Appellant. | ) | The Honorable |
| | ) | Earl B. Hoffenberg, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices COBBS and LAVIN concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defendant's claim that his trial counsel was ineffective for failing to object to the joinder of three underlying cases is without merit, as defendant cannot establish that he suffered prejudice. We reject defendant's claim that a witness's identification testimony was insufficient to support his convictions for vehicular hijacking and possession of a stolen motor vehicle. However, the trial court erred in imposing extended-term sentences on the convictions of unlawful restraint and criminal trespass to a residence, and thus we modify the mittimus to reflect nonextended sentences on those counts.

¶ 2    Following a joint bench trial of three underlying cases, defendant contends that: (1) his trial

counsel was ineffective in failing to object to the joinder; (2) his convictions in case 16 CR 7564

should be reversed because the State's eyewitness identification testimony was unreliable, and (3) the court improperly imposed extended-term sentences on certain Class 4 convictions in case 16 CR 7563, as he was also convicted of an offense in a more serious class. For the following reasons, we reject defendant's first two claims and affirm his convictions. However, we agree with defendant that extended-term sentences were improperly imposed on certain convictions, and we modify those sentences to nonextended terms.

¶ 3                                    BACKGROUND

¶ 4        This appeal concerns three separate cases that were tried together. In case 16 CR 7564, defendant was charged with offenses that occurred on or about April 3, 2016: vehicular hijacking; possession of a stolen motor vehicle (PSMV) with respect to a Toyota Camry; identity theft; and unlawful possession of a credit card. The other two cases, 16 CR 7562 and 16 CR 7563, concerned offenses allegedly committed on April 27, 2016. In case 16 CR 7562, defendant was charged by indictment with three counts of aggravated battery to a police officer; PSMV with respect to a Toyota RAV4, and aggravated assault against a police officer. In case 16 CR 7563, defendant was charged with four counts of unlawful restraint, criminal trespass to a residence, and possession of a controlled substance.

¶ 5        Before trial, the State filed a motion for joinder of all three cases, arguing that the charged offenses were "all part of the same comprehensive transactions." Defense counsel told the court that it had no objection to the State's motion for joinder, which was allowed.

¶ 6        At the ensuing bench trial, Siththy Mohideen (Siththy) testified regarding the incident that formed the basis for case 16 CR 7564. On the morning of April 3, 2016, Siththy and her husband, Mohammed, went to a grocery store in a Toyota Camry owed by their daughter, Fatimah. Siththy stayed in the car while Mohammed went inside the store. While she was

looking at her phone, a man entered the car. She initially thought the man was Mohammed, but when she looked up, she saw it was a different man and screamed. Siththy identified defendant as the man who entered her car. Defendant threatened to kill her and told her to get out of the car. Siththy testified that she could see defendant's face and that his face was "not covered." Siththy exited the Camry, and defendant drove away in it. Siththy ran inside the store and called police.

¶ 7    During Siththy's testimony, the State published video footage from a security camera outside the store. Siththy identified points in the video when her husband left the car, when defendant approached and entered the car, and when she ran out of the car. Siththy further testified that on April 13, 2016, she met with detectives at a police station, where she was shown a photo array and identified a photograph of defendant. The photo array, which was admitted into evidence, included photographs of six men, including defendant. Three of the men in the photo array (including defendant) are bald, two have short hair, and one has medium-length hair. Two the six men were clean-shaven, and the other four (including defendant) had short facial hair on their upper lips and chins. Defendant was one of two bald men in the array who also had facial hair.

¶ 8    On cross-examination, Siththy acknowledged that she was looking at her phone and texting her daughter when the offender entered the car. She stated that the man had "no hair" and a "little bit" of a beard. She acknowledged the incident happened very quickly, and that she was in the car with the offender for "like five seconds." However, she testified that he turned toward her and that she saw his whole face. She agreed that the incident was "scary" and that she was nervous. Regarding her initial description, she testified she told police that the offender was a bald white man who was a "little chubby" with a "little bit" of a beard, and that his face was red and "not normal."

¶ 9    When defense counsel cross-examined Siththy about the photo array, she agreed that she selected defendant's photograph "right away." She acknowledged that the array included three men with no hair on their heads. She initially agreed with defense counsel's suggestion that only one of the three bald men also had a beard; however, the State objected and the trial court noted that defense counsel's question did not accurately reflect the photo array.[1] Siththy subsequently acknowledged that multiple men in the photo array had facial hair.

¶ 10   Fathima Ameer testified that Siththy is her mother. In April 2016, while Ameer was out of the country, she allowed her parents to use her Toyota Camry, as well as her credit card.

¶ 11   Detective Thomas Beck testified that he was assigned to investigate the April 3 carjacking incident. Beck was "put in contact" with Detective Hernandez of the Burbank Police Department, who told Beck that the missing vehicle "and the subject was identified from an incident in their town." Using the name provided by Hernandez, Beck composed a photo array and arranged for Siththy to view it. Beck did not show the array to Siththy because the police use an "independent administrator" with "no knowledge of the facts of the case" to present photo arrays. Beck later learned that Siththy identified defendant in the array.

---

[1] The relevant exchange is as follows:
    "Q. [DEFENSE COUNSEL:] Okay. Now in [the photo array] there is [sic] three men who have no hair on their head?
        A. Yeah.
        Q. Okay. There is only one though with no hair whose [sic] got hair on his chin, correct?
        A. Yeah.
        Q. And that's the one you picked?
        A. Right.
        Q. Okay. So is it safe to say that you picked the person out of the picture who was bald and had hair on their chin?
        [STATE'S ATTORNEY]: Objection to that characterization, Judge.
        THE COURT: That's not a proper question.
        [DEFENSE COUNSEL]: I will re[-]ask it.
        THE COURT: Well, I have to tell you that's not true. What I'm saying is let the record reflect there [are] two people that do have a mustache. If you look, there is another gentlemen [sic] that does have it. Your statement that he's the only one is not correct."

¶ 12  Mohammed Nejari testified that on April 20, 2016, he was working as a delivery driver for a Domino's Pizza in the 3100 block of West Devon Avenue. He was parked outside the restaurant in his Toyota RAV4, preparing to leave for a delivery, when he realized that he had forgotten part of the order. He left the vehicle and returned to find that the RAV4 was gone. He did not see who took the vehicle. Approximately a week later, police informed Nejari that the RAV4 had been found. Nejari never met defendant or gave him permission to drive the RAV4.

¶ 13  Chicago Police Officer Jeremiah Johnson testified that in April 2016, he was looking for defendant in connection with a vehicular hijacking that occurred on April 3, 2016. Johnson spoke to defendant's mother and a security guard who worked in her building. On April 27, the security guard provided information that defendant had been seen with a Toyota RAV4 with a certain plate number. Johnson and his partner, Officer Adam Criscione, went out to find defendant and the RAV4. About 20 to 30 minutes later, they saw defendant driving the vehicle.

¶ 14  Johnson and Criscione followed defendant while they alerted other officers. When they were directly behind the RAV4, they activated their lights and approached the RAV4 on foot. Criscione walked to the driver's side, while Johnson approached the passenger's side window. Johnson announced that they were police and "pounded" on the window, at which point defendant looked at him, "turned the wheel and floored the gas in the car." The RAV4 "jumped up onto the curb" and struck Johnson, who was pushed against a building. Johnson sustained a small cut on his finger but was otherwise uninjured. Criscione jumped back into the police car and pursued defendant down the alley. Johnson radioed and another officer, Jason Norwick, picked him up in Norwick's vehicle.

¶ 15  Johnson and Norwick subsequently learned of defendant's possible location and proceeded to an alley behind an address in the 4000 block of North Western Avenue. They met with other

officers, including Sergeant Stack.[2] Johnson and other officers went to the top floor, where there was blood on the door. The door was locked and police made a forced entry. Inside, Johnson saw what appeared to be family of four, including an adult male. The police asked "where is he" and the male "motion[ed] with his head" to his left. Johnson "peek[ed] around the door" and saw defendant. Defendant told police something to the effect of "[t]hese are my friends," after which the male shook his head. As police tried to place him in custody, defendant "flail[ed] his arms" and resisted arrest. Johnson handcuffed defendant and removed him with the assistance of another officer.

¶ 16   Johnson then went to look at the RAV4 that defendant had been driving. On the driver's seat, in plain view, he saw a "plastic baggy" of suspect narcotics, which he recovered and inventoried. Johnson later learned that additional suspect narcotics were recovered after a custodial search of defendant's person.

¶ 17   Similar to Johnson's testimony, Detective Adam Criscione recalled that on April 27, 2016, they saw defendant in a vehicle, after which they walked up to separate sides of the vehicle. As the officers approached, Criscione heard the "revving of the engine" as defendant's vehicle turned into an alley. Johnson was pushed up against a wall by defendant's vehicle, which then drove away in a "reckless manner." After he saw Johnson stand up, Criscione returned to their police vehicle and pursued defendant. Criscione lost sight of defendant's vehicle, but later heard over police radio that defendant was in custody.

¶ 18   Officer William Seski testified that he was one of the officers involved in the pursuit of defendant on April 27, 2016. Near the intersection of Western Avenue and Irving Park Road, he observed a red SUV and a Chicago Police vehicle, both of which were unoccupied. A woman

---

[2] The record reflects that Stack was a sergeant as of April 2016 but was a lieutenant at the time of trial.

then ran toward him and told him that the residents of the apartment above her were being held against their will by an intruder. The woman pointed out the top floor of a residence in the 4000 block of Western Avenue. Seski communicated that information to other officers.

¶ 19    Eva Gelfand testified that she was driving near the intersection of Western Avenue and Irving Park Road when she heard police sirens. She saw an SUV at "very high speed" turn in front of her before crashing into a parked car. A man, whom she identified as defendant, exited the SUV and ran westbound on Cuyler. A short time later, Gelfand told a police officer what had happened.

¶ 20    Lieutenant Thomas Stack of the Chicago Police Department testified that on April 27, 2016, he was driving a police vehicle when he learned of a pursuit that led him to the intersection of Western Avenue and Irving Park Road. Stack stopped after observing an unoccupied SUV. A number of citizens indicated that the SUV's driver fled westbound on Cuyler Avenue. Stack ran in that direction and radioed other officers. As Stack was searching on foot, he heard a radio transmission indicating that a suspect had entered an apartment at a residence in the 4000 block of North Western Avenue and was holding the residents against their will. Stack proceeded to that address, where he met other officers. Police went upstairs to the back door of the apartment, where Stack noticed blood on the door. After Stack knocked and announced his office, police forcibly entered the residence. Inside, Stack observed a "couple Asian people" including a male. Stack asked "where is he" and the male "nodded his head to the left." Stack then saw defendant in the kitchen area "trying to conceal himself." Stack recalled that defendant initially told police that he knew the people in that apartment. Defendant resisted arrest but police eventually handcuffed him.

¶ 21    Officer Fernando Flores testified that he was one of the officers who entered the apartment and helped apprehend defendant. After defendant was in custody, Flores observed as another officer patted defendant down and recovered suspected narcotics from his clothing.

¶ 22    Suwit Yantaratanawan (Suwit) testified that he lived in the top floor apartment of a residence in the 4000 block of North Western Avenue with his wife, Naruemon Makevilai (Naruemon), and their two children. The family was home on the afternoon of April 27, 2016, when Suwit heard banging on the back door. A man, whom Suwit identified as defendant, entered the apartment and shut the door. Defendant appeared to be nervous and said he "need[ed] a place to hide." Suwit told Naruemon to call her sister, Nattaphak Preechapongmit (Nattaphak), who lived on the first floor of the same building. Suwit spoke to defendant and tried to calm him down, as defendant repeatedly looked out of the window. Suwit heard footsteps coming from the stairs outside, after which police entered. As the police approached, defendant went to the kitchen and hid. When police entered, Suwit signaled to let them know where defendant was hiding.

¶ 23    Naruemon similarly testified that she heard banging shortly before defendant, whom she identified in court, entered the apartment.[3] While her children hid in a closet, Naruemon called her sister-in-law, Nattaphak, and told her that there was a stranger inside Naruemon's home. Nattaphak also testified that Naruemon called her on April 27, 2016.[4] Nattaphak looked out her window and saw police cars. Nattaphak approached a police officer and told him that there was a stranger in Naruemon's apartment.

¶ 24    Detective Timothy O'Brien testified that he and Beck conducted a videotaped interview of defendant on April 28, 2016, after advising him of his *Miranda* rights. O'Brien identified People's Exhibit 21 as an accurate video recording of the interview, which was admitted and

---

[3] Naruemon, whose native language is Thai, testified through an interpreter.
[4] Nattaphak indicated that she speaks some English but testified in Thai through an interpreter.

published. O'Brien testified that during the interview, defendant offered to reveal the location of the Camry taken in the April 3 carjacking if he could make a "deal." When O'Brien told defendant that he could not make a deal, defendant responded that he "wasn't going to take an extra six years for that car." O'Brien further testified that when he asked defendant about Nejari's RAV4, defendant claimed that the owner of that vehicle "told him to burn the car for him." O'Brien also stated that defendant admitted that he went into Suwit's apartment and that he tried to pay the occupants to allow him to stay there.

¶ 25 O'Brien further stated that, at the time of his arrest, defendant was wearing a jacket with "striping along the arms." O'Brien testified that he reviewed video footage of the April 3 carjacking involving Siththy, and that he believed the offender in that footage was wearing the same jacket that defendant wore when he was arrested.

¶ 26 On cross-examination, O'Brien acknowledged that defendant never admitted to taking the Camry. He also admitted that he did not actually see defendant wearing the striped jacket, but stated he had seen the jacket after it was inventoried by other officers.

¶ 27 The State introduced a number of stipulations. Among these, the parties stipulated that a Chicago Police Department evidence technician would testify that she recovered swabs from the RAV4's gear shift and steering wheel. A forensic scientist with the Illinois State Police would testify that the swab from the gear shift indicated a mixture of two people, including a major DNA profile that matched defendant, and that defendant could not be excluded from the DNA mixture from the swabs of the steering wheel. The parties also stipulated that Officer McGary would testify that he recovered three "baggies" of suspect cocaine from defendant's sweatshirt pocket, and that

a forensic chemist with the Illinois State Police would testify that items recovered from defendant and RAV4 tested positive for cocaine.[5]

¶ 28   Following the stipulations and the admission of the State's exhibits, the State's Attorney requested a continuance to locate the jacket referenced by O'Brien and present it to the court. The court denied that request, and the State rested.

¶ 29   Defendant's motion for a directed verdict was denied. Defendant elected not to testify, and the defense rested without presenting any evidence.

¶ 30   In its findings with respect to case 16 CR 7564, concerning the April 3 carjacking of the Camry, the court found defendant guilty of vehicular hijacking and PSMV, explaining that it found Siththy's testimony "very clear and convincing," and that she picked defendant out of a "pretty good lineup" that "wasn't suggestive." The court also noted that defendant "hurts himself by saying, let's make a deal. Where's the car? Let's make a deal. You know, I'm not going to do it for six years." The court remarked that this was "a form of admission that he knew where the car was." The court acquitted defendant of the charges of identity theft and possession of a credit card.

¶ 31   With respect to case 16 CR 7562, the court acquitted defendant of all three counts of aggravated battery to a police officer, citing Johnson's testimony that he was not injured. However, the court found him guilty of PSMV with respect to the RAV4 and guilty of aggravated assault against Johnson. With respect to case 16 CR 7563, the court found defendant guilty of all counts, including four counts of unlawful restraint, criminal trespass to a residence, and possession of a controlled substance.

¶ 32   Defendant's motion for judgment notwithstanding the verdict or a new trial was denied.

---

[5] Officer McGary's first name is not stated in the trial transcript.

¶ 33    Defendant's presentence investigative report reflected numerous convictions dating from 1989. His criminal history included multiple PSMV convictions, an armed robbery conviction, and multiple prior convictions for retail theft and possession of a controlled substance.

¶ 34    At defendant's sentencing hearing, the State pointed out that defendant had two pending cases, including a case for aggravated PSMV. The State argued that defendant was subject to sentencing as a Class X offender given his criminal history. The court remarked that the convictions in case 16 CR 7563 were "Class 4 [offenses], but they're extendable" and indicated that the sentencing range was between one and six years' imprisonment. Counsel for the State and defendant expressed their agreement.

¶ 35    Following argument in mitigation and aggravation, defendant spoke in allocution. He expressed remorse for his actions, stated that "the drugs really had me," and asked for substance abuse treatment while incarcerated.

¶ 36    In imposing sentence with respect to case 16 CR 7564, the court merged the PSMV count into the vehicular hijacking count and sentenced defendant, as a Class X offender, to 20 years' imprisonment on the vehicular hijacking count. In case 16 CR 7562, the court merged the conviction for aggravated assault against Johnson into the PSMV conviction and imposed a 20-year sentence on the PSMV count, to run concurrent with the 20-year sentence imposed in 16 CR 7564. In case 16 CR 7563, the court sentenced defendant to extended-term sentences of six years on each of the four convictions of unlawful restraint, as well as the convictions for possession of a controlled substance and criminal trespass to residence.[6] In doing so, the court noted: "So I'm

---

[6] We note that the written sentencing order in case 16 CR 7563 appears to include a clerical error, insofar as it does not specify the imposition of the extended-term six-year sentence for the unlawful restraint conviction under count I, yet elsewhere states: "On Count 001, defendant having been convicted of a Class 4 offense is sentenced as a class x offender * * *." However, the trial court's oral pronouncement is the judgment and controls in the event of any conflict with the written sentencing order. See *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 87. The transcript from defendant's sentencing makes clear (and the parties do not dispute) that the court imposed a six-year extended

going to give you the max on those, 6 years IDOC" but specified that those sentences would "run concurrent with the 20-year sentence[s]" imposed in cases 16 CR 7562 and 16 CR 7564.

¶ 37    Defendant's motion to reconsider sentence was denied, and defendant filed a timely notice of appeal.

¶ 38                                    ANALYSIS

¶ 39    On appeal, defendant raises three distinct claims of error. First, he contends that he was deprived of effective assistance of counsel when his trial counsel failed to object to the joinder of the three cases. Second, he contends that his convictions in case 16 CR 7564, pertaining to the April 3 carjacking, should be reversed because Siththy's identification testimony was unreliable. Finally, he asserts that the court erred in imposing extended-term sentences on his convictions for the Class 4 offenses of unlawful restraint and criminal trespass to a residence, since they were not the most serious class of offense for which he was convicted. We address these arguments in turn.

¶ 40    Defendant's primary argument is that his trial counsel was ineffective in failing to object to the State's request to the "improper joinder" of all three cases. He asserts that case 16 CR 7564, arising from the April 3, 2016 carjacking of the Camry in Siththy's presence, was "entirely separate" from cases 16 CR 7562 and 16 CR 7563, which concerned events on April 27, 2016. He claims that his counsel acted unreasonably in not objecting to the joinder, and that he suffered resulting prejudice and an unfair trial because the joinder allowed the trial court to hear "what amounted to evidence of other crimes in each case." On that basis, he asks that we reverse and remand for new, separate trials.

---

term sentence on the unlawful restraint conviction under count I, just as it did with respect to the three other unlawful restraint convictions and the criminal trespass to residence conviction.

¶ 41　In determining whether a defendant was denied effective assistance of counsel, "we apply the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Cherry*, 2016 IL 118728, ¶ 24. Under that test, a defendant "must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. [Citation.]" *Id.* Specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Id.* In assessing the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The prejudice prong "is not simply an outcome-determinative test but, rather, may be satisfied if defendant can show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327-28 (2011).

¶ 42　The failure to establish either prong of the *Strickland* inquiry precludes a finding of ineffective assistance of counsel. *Cherry*, 2016 IL 118728, ¶ 24 (citing *People v. Henderson*, 2013 IL 114040, ¶ 11). If defendant cannot establish prejudice, we need not separately analyze whether counsel's conduct was unreasonable. See *Evans*, 186 Ill. 2d at 94 ("[I]f the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient. [Citations.]").

¶ 43　In order to assess defendant's claim of ineffective assistance, we briefly review the law regarding joinder. Section 114-7 of the Code of Criminal Procedure of 1963 provides that "[t]he court may order 2 or more charges to be tried together if the offenses and the defendants could have been joined in a single charge." 725 ILCS 5/114-7 (West 2018). In turn, under section 111-4(a) of the

Code, two or more offenses may be charged in the same indictment if they are "based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2018). In determining whether a defendant's acts were part of the same comprehensive transaction, "the most crucial factors to consider include: the proximity of time and location of the various charges, the identity of evidence which would be presented to prove each charge; whether the offenses shared a common method; and whether the same or similar evidence would establish the elements of the offenses." (Internal quotation marks omitted.) *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 36. The trial court has "substantial discretion" in determining whether joinder of offenses is proper. *People v. Marts*, 266 Ill. App. 3d 531, 542 (1994).

¶ 44    In this appeal, the parties devote substantial argument debating whether the separate crimes in the three underlying cases were part of the same transaction, and, in turn, whether defense counsel's failure to object to the joinder constituted deficient performance under the first prong of the *Strickland* analysis. However, we need not discuss the first prong, as we conclude that defendant cannot satisfy the second prong, *i.e.*, prejudice from counsel's failure to object to the joinder. As explained below, we find that, even assuming *arguendo* that counsel was deficient in failing to object to the joinder, defendant's claim of resulting prejudice is unavailing.

¶ 45    Given that there were three separate cases joined concerning offenses committed on two separate dates, we clarify the precise nature of defendant's prejudice claims. Defendant argues that his counsel's failure to object to the joinder resulted in prejudice because it allowed the trial judge to hear other-crimes evidence that would otherwise be inadmissible, and that the trial court "likely relied" upon such other-crimes evidence in finding him guilty. Defendant primarily claims that the joinder prejudiced his defense in case 16 CR 7564, regarding the April 3, 2016 carjacking of

the Camry. Specifically, he suggests that evidence pertaining to case 16 CR 7562, *i.e.*, that defendant "was seen in a stolen car [the RAV4] and led police on a high speed chase" on April 27, 2016 prejudiced the court against him with respect to the charges concerning the April 3, 2016 carjacking. That is, he suggests that evidence of the events on April 27 made the court "more likely to believe" that defendant previously stole the Camry. Separately, defendant suggests he was prejudiced because evidence of the April 3 carjacking constituted inadmissible "other-crimes" evidence with respect to the two remaining cases concerning offenses on April 27, as "none of the evidence concerning the [April 3] car jacking of Siththy was admissible" for any permissible purpose in the other cases.

¶ 46    We reject defendant's claims of prejudice. Keeping in mind that this was a bench trial, defendant cannot establish that joinder prejudiced his defense in any of the three cases, or that the court improperly relied on evidence from other cases to reach its findings of guilt in each specific case. Stated differently, defendant cannot demonstrate a reasonable probability that the result in any of the cases would have been different, even without the joinder.

¶ 47    In reaching this conclusion, we are guided by our precedent discussing other-crimes evidence, which clearly differentiates between its impact in a jury or a bench trial. Evidence of other crimes is not admissible for the purpose of demonstrating a defendant's propensity to commit a crime. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). "Such evidence is generally inadmissible because it carries an extreme risk of prejudice in that it can lead to 'the jury convicting a defendant because he or she is a bad person deserving punishment.' " *People v. Felton*, 2019 IL App (3d) 150595, ¶ 42 (quoting *Donoho*, 204 Ill. 2d at 170). Other-crimes evidence is admissible for other purposes, " 'such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' "
*Felton*, 2019 IL App (3d) 150595, ¶ 43 (quoting Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)).

¶ 48    Significantly, "[t]he prejudicial effect of other-crimes evidence is almost exclusively discussed in terms of impact on a *jury*. [Citations.]" (Emphasis in original.) *Felton*, 2019 IL App (3d) 150595, ¶ 47. On the other hand, in a bench trial, there is a rebuttable presumption that the trial court considers evidence only for proper purposes. See *People v. Jones*, 2017 IL App (1st) 143403, ¶ 36 (the trial court, "as the trier of fact, is presumed to know the law and to have considered only competent evidence in making a determination on the merits."); *Felton*, 2019 IL App (3d) 150595, ¶ 47 ("Unlike a jury, a trial judge is presumed to know the law and to apply it correctly. [Citation.]"). "To rebut this presumption, the record must affirmatively show that the trial court actually used the evidence improperly." *Jones*, 2017 IL App (1st) 143403, ¶ 36.

¶ 49    Consistent with this presumption, "[t]he risk of undue prejudice normally accompanying the admission of large amounts of other-crimes evidence is significantly diminished where the trier of fact is not a jury but a judge. [Citation.]" *Felton*, 2019 IL App (3d) 150595, ¶ 47. This court has explained:

> "The rule generally barring other-crimes evidence is based on the belief that the introduction of the evidence may over-persuade a jury to convict a defendant only because the jury believes the defendant is a bad person deserving punishment. [Citation.] In a bench trial, this fear is assuaged; it is presumed that the trial court considered the other-crimes evidence only for the limited purpose for which it was introduced. [Citation.]" *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24.

¶ 50    In light of this presumption and on the record before us, defendant cannot establish prejudice from the admission of other-crimes evidence that resulted from joinder. In turn, he cannot show

that he suffered prejudice from his defense counsel's failure to object to the joinder. The record does not rebut the presumption that the court considered evidence from each of the three underlying cases for proper purposes. Specifically, the record does not support defendant's suggestion that the court improperly relied on evidence of the offenses committed on April 27 to find that defendant committed the April 3 carjacking in case 16 CR 7564. Nor do we find that the trial court improperly relied on the April 3 carjacking to find defendant guilty of any of the offenses charged in the other two cases.

¶ 51    In his reply brief, defendant acknowledges the presumption that the trial judge will only consider competent evidence in reaching its findings. However, he suggests that two comments by the trial court demonstrate that it "expressly considered" evidence from case 16 CR 7562 in finding that defendant committed the April 3 carjacking of the Camry in case 16 CR 7564. First, defendant notes the court's comment, in finding defendant guilty of PSMV of the RAV4, that: "The witness [Nejari] left the car running and he went back into the place, * * * and that's what's going on with all hijackings, all vehicular stolen vehicles." Defendant's reliance on that comment is unpersuasive. First, viewing the remark in context, the record shows that the court made it in explaining its finding that defendant was guilty of possessing the stolen RAV4 in case 16 CR 7562. Thus, it does support his claim that the court relied on other-crimes evidence to find him guilty with respect to the April 3 carjacking in case 16 CR 7564. In any event, the court's remark "that's what's going on with all hijackings, all vehicular stolen vehicles" is so vague and non-specific that we cannot interpret it to mean that court was improperly relying on other-crimes evidence.

¶ 52    Defendant also directs our attention to the court's comment, after it credited Siththy's identification testimony, that: "There is much corroboration on the identification and the

statement that he made and the totality of all the circumstances since they were tried together that obviously he likes to steal cars." We do not find that this comment rebuts the presumption that the court relied on competent evidence regarding the April 3 carjacking to find him guilty of the offenses in that case. Significantly, immediately before this statement, the court emphasized that it found Siththy's testimony "clear and convincing," indicating that it relied on that eyewitness testimony to find defendant guilty.

¶ 53 We acknowledge that the court's comment that defendant "likes to steal cars" suggests its belief that defendant had a propensity to commit this sort of crime. However, we do not read the court's comment to mean that court was improperly *relying on* evidence of the subsequent theft of the RAV4 to find that defendant committed the April 3 carjacking. The "likes to steal cars" comment is properly viewed as reflecting the court's findings that defendant was guilty of stealing the Camry in case 16 CR 7564 and the RAV4 in case 16 CR 7562, after properly considering the corresponding evidence *in each respective case*. Thus, we do not find that either of the comments identified by defendant amounts to an affirmative showing rebutting the presumption that the trial court properly considered only competent evidence in reaching its findings. See *Jones*, 2017 IL App (1st) 143403, ¶ 36.

¶ 54 In sum, defendant cannot show that, in reaching its findings of guilt in each of the three cases, the trial court improperly relied on evidence from any of the other cases were joined. In turn, for purposes of the *Strickland* prejudice inquiry, he cannot show a "reasonable probability" that the result would have been different, even had his trial counsel successfully objected to the joinder of the three cases. See *Cherry*, 2016 IL 118728, ¶ 24. As he cannot satisfy the prejudice prong of the *Strickland* inquiry, his ineffective assistance of counsel claim fails.

¶ 55 We turn to defendant's second claim of error, in which he asserts that the evidence was insufficient to sustain his convictions for vehicular hijacking and PSMV in case 16 CR 7564, stemming from the April 3 carjacking of the Camry. Specifically, he claims that Siththy's identification testimony was dubious and unreliable. On that basis, he seeks outright reversal of the vehicular hijacking and PSMV convictions.

¶ 56 When reviewing a challenge to the sufficiency of the evidence, we consider "whether, viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). "[I]n a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence. [Citations.]" *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). A reviewing court "will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71.

¶ 57 Defendant does not challenge the State's proof of any particular element of vehicular hijacking or PSMV with respect to the Camry, but attacks Siththy's identification testimony as unreliable. Although "[i]dentification evidence which is vague or doubtful is insufficient to support a conviction," a single witness' identification is sufficient to sustain a conviction "if the witness viewed the accused under circumstances permitting a positive identification." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. In assessing identification testimony, we consider five factors derived from *Neil v. Biggers*, 409 U.S. 188 (1972), namely: (1) the witness' opportunity to view the defendant during the offense; (2) the witness' degree of attention at the time of the offense;

(3) the accuracy of the witness' prior description of the defendant; (4) the witness' level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. *Joiner*, 2018 IL App (1st) 150343, ¶ 47. No single factor is dispositive, and "the trier of fact is to take all of the factors into consideration." *Id.* (citing *Biggers*, 409 U.S. at 199-200). Further, we are mindful that eyewitness testimony "is insufficient only if the record compels the conclusion that no reasonable person could accept that testimony beyond a reasonable doubt. [Citation.]" *People v. Charles*, 2018 IL App (1st) 153625, ¶ 25.

¶ 58    Defendant suggests that application of the five *Biggers* factors leads to the conclusion that Siththy's identification testimony was unreliable. We disagree.

¶ 59    With respect to the first factor, "[w]hen considering whether a witness had an opportunity to view the offender at the time of the offense, courts look at whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." (Internal quotation marks omitted.) *In re J.J.*, 2016 IL App 160379, ¶ 27. In arguing that the first factor weighs against Siththy's identification, defendant notes that her "opportunity to view the offender was extraordinarily brief and limited." Defendant emphasizes Siththy's testimony indicating that the carjacking occurred in "five seconds" and that video footage indicates that approximately three seconds passed between the time the offender entered the Camry and when Siththy left the car. However, despite the brevity of the encounter, Siththy repeatedly and unequivocally testified that she saw defendant's face. This court has confirmed that the trier of fact may credit identifications made during very brief encounters. See, *e.g.*, *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 30 (trial court could find witness had adequate opportunity to view defendant, even assuming that opportunity "lasted seconds rather than minutes"); *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32 (identification testimony credible although the "entire

incident took less than a minute"); *People v. Parks*, 50 Ill. App. 3d 929, 932-33 (1977) (identification from attack lasting "five to ten seconds" sufficient to sustain conviction).

¶ 60 Apart from the brief nature of the encounter, defendant also claims that Siththy's view was obstructed. He notes that video footage of the incident shows that the offender was wearing a hat and a hood, and posits that these "likely blocked Siththy's view of the offender's face." He also notes that Siththy was "wearing a scarf on her head, was texting with her daughter when the man got into the car, and she admitted that she did not immediately look at the offender." However, Siththy never testified that her view was obstructed. To the contrary, she testified that defendant's face was "not covered" and that she saw his whole face when he turned toward her. Moreover, there is no dispute that the offender was in the vehicle with Siththy when she saw him; the trial court could certainly have found that the closeness of the encounter also weighed in favor of the reliability of Siththy's identification. See *In re J.J.*, 2016 IL App (1st) 160379, ¶ 28 (finding that first *Biggers* factor supported identification and noting that "defendant was close enough to reach out his arm and touch the victim's chest with the gun"). Despite the brevity of the incident, the trial court was entitled to find that Siththy had sufficient opportunity to view the offender.

¶ 61 With respect to the second *Biggers* factor—Siththy's degree of attention—defendant argues that it is "likely that stress affected Siththy's ability to make an accurate identification." Defendant cites the Supreme Court of New Jersey's decision in *State v. Henderson*, 208 N.J. 208 (2011) for the proposition that scientific research indicates that high stress negatively impacts a witness's ability to recall and make an accurate identification. Defendant notes Siththy's testimony that she screamed when she saw the offender and panicked as she ran from the car. "Illinois courts have recognized that the stress of a crime can contribute to the unreliability of eyewitness testimony."

*In re J.J.*, 2016 IL App (1st) 160379, ¶ 30 (citing *People v. Lerna*, 2016 IL 118496, ¶ 28). However, defendant does not cite any Illinois precedent suggesting that the trial court must discount the reliability of an identification where the witness was in a stressful situation. Moreover, nothing in the trial record suggests that the stress of the incident diminished Siththy's ability to pay attention when she saw defendant. Indeed, her testimony included details about defendant's appearance and his statements to her. The trial court was entitled to find that this indicated a sufficient degree of attention to support her identification. See *People v. Blankenship*, 2019 IL App (1st) 171494, ¶ 29 (finding that witness's degree of attention favored the State where witness "was able to give a detailed account of the events of the robbery and the physical description of both defendant and gun."); *In re J.J.*, 2016 IL App (1st) 160379, ¶ 30 (rejecting defendant's argument that fear prevented witness from paying adequate attention, where the witness's testimony was "detailed and descriptive and indicated that she was acutely aware of what was happening during the encounter").

¶ 62 Regarding the third *Biggers* factor—accuracy of the prior description—defendant contends that the description Siththy provided to police was "vague and general, undermining any confidence in [her] ability to observe and recall accurately." Siththy told police that the offender was a "chubby" white man with no hair on his head and a "little bit" of a beard. Defendant posits that "any number of people" could have matched that description. As the State acknowledges, Siththy's prior description was general. However, it is well-settled that a general description does not preclude the trial court from finding an identification reliable. A witness " 'is not expected or required to distinguish individual and separate features of a suspect in making an identification. Instead, a witness' positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made.' " *People v.*

*Tomei*, 2013 IL App (1st) 112632, ¶ 52 (quoting *People v. Slim*, 127 Ill. 2d 302, 308-09 (1989));

*People v. Williams*, 2015 IL App (1st) 131103, ¶ 75 ("Where the witness makes a positive

identification, precise accuracy in the preliminary description is not necessary. [Citation.]").

Thus, although the third *Biggers* factor does not strongly weigh in the State's favor, it certainly

did not preclude the trial court from crediting Siththy's identification.

¶ 63    With respect to the fourth *Biggers* factor, defendant does not dispute that Siththy indicated she

was certain in identifying defendant in the photo array. However, he argues this factor "deserves

little weight." Defendant directs our attention to the statement from the Seventh Circuit Court of

Appeals that "[p]sychological research has established that the witness's faith is equally strong

whether or not the identification is correct." *Newsome v. McCabe,* 319 F.3d 301, 305 (7th Cir.

2003). However, defendant did not present expert testimony at trial on this subject; in such

situations "[t]his court has found defendant's argument unpersuasive where no such evidence

was presented to support a finding that the witness's certainty should be given little weight."

*Blankenship*, 2019 IL App (1st) 171494, ¶ 32 (citing *Tomei*, 2013 IL App (1st) 112632, ¶ 56

("Since defendant did not present expert testimony, we do not find persuasive that the fourth

factor, the witness's level of certainty, should be given little weight")).

¶ 64    Defendant otherwise argues that Siththy's level of certainty "does not lend reliability to her

identification given the suggestiveness of the photo array."[7] Specifically, he notes that of the six

subjects in the array, only "three had no hair, and of those, only two had a beard." Thus, he

---

[7] The record does not reflect that defendant moved to suppress the photo array identification. Thus, defendant's contention that the photo array was unduly suggestive was forfeited. See *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007) (To preserve an error for appellate review, a defendant must both object at trial and raise the issue in a posttrial motion). However, the State does not claim on appeal that defendant forfeited this argument by failing to raise in in the court below. "The State may forfeit a claim of forfeiture by failing to raise it." *People v. Jones,* 2018 IL App (1st) 151307, ¶ 47. Thus, the State has forfeited any claim of forfeiture. See *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 29 (finding that State forfeited argument that defendant forfeited his claim that trial court erred in denying pretrial motion to suppress photo array and lineup).

argues that only two of the six subjects matched Siththy's description, such that she had a "50% chance" of selecting defendant from the array.

¶ 65   We find no merit to defendant's claim that the photo array was unduly suggestive. "Criminal defendants have a due process right to be free from identification procedures that are unnecessarily suggestive and conducive to irreparable mistaken identification." *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 32 (quoting *People v. Jones*, 2017 IL App (1st) 143766, ¶ 27.) "The participants in a lineup or photo array should not appear grossly dissimilar to the suspect. [Citation.]" *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 25. Under the Code of Criminal Procedure of 1963, a lineup "shall be composed to ensure that the suspected perpetrator does not unduly stand out" and the suspect "shall not be substantially different in appearance from the fillers based on the eyewitness' previous description of the perpetrator." 725 ILCS 5/107A-2(f)(3) (West 2016). "The law, however, does not require the participants in a photo array or lineup 'to be identical or near identical.' " *Ortiz*, 2017 IL App (1st) 142559, ¶ 25 (quoting *People v. Faber*, 2012 IL App (1st) 093273, ¶ 57). Indeed, a photo array or lineup is not unduly suggestive merely because defendant is the only subject with a particular characteristic. See, *e.g.*, *Faber*, 2012 IL App (1st) 093273, ¶ 57 (lineup not unduly suggestive where the defendant was the only person wearing a sleeveless T-shirt, which a witness had described the offender as wearing); *People v. Kelley*, 304 Ill. App. 3d 628, 638 (1999) (lineups not unduly suggestive even where defendant was the only person with an "Afro" hairstyle in one lineup and "french braids" in another lineup).

¶ 66   After reviewing the photo array that was presented in this case, we do not find that it was unduly suggestive. Defendant was not substantially different in appearance from the five other participants. All six individuals in the photo array were males that appeared to be roughly the

same age and build with similar skin tone. Three of the men in the photo array (including defendant) were bald, two had short hair, and one had medium-length hair. Two the six men were clean-shaven; the other four (including defendant) had short facial hair on their upper lips and chins. None of the six men had more than a slight mustache, none had a thick beard, and none had sideburns. We recognize that defendant was one of two men in the array who was bald and had facial hair. However, despite some variation among the six subjects, there were not such significant differences between defendant and the other five men so as to render the array improperly suggestive. See *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007) (in rejecting claim that photo array was improperly suggestive, explaining "[w]hile defendant contends he was the only person who was actually bald in the photo array, we note all of the individuals had very close cropped hair in the pictures, which appeared similar to defendant's hairstyle in the picture shown to [witness.]"). Thus, we reject defendant's suggestion that this case bears any resemblance to the situation in *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 62 (concluding that lineup was unduly suggestive where defendant was the only participant "with three particular articles of clothing, a unique hairstyle [dreadlocks], and a facial feature matching the description of the offender.").

¶ 67    Apart from arguing that it was suggestive, defendant alternatively attacks the photo array by stating that "the record does not demonstrate that the police complied with state law" in conducting the photo array, pursuant to the requirements of section 107A-2(e) of the Code of Criminal Procedure of 1963. 725 ILCS 5/107A-2(e) (West 2016). Specifically, defendant urges that there was no evidence in the record that "Siththy signed a lineup advisory form or was otherwise informed that the offender might not be in the lineup and she did not need to identify anyone." These arguments are not persuasive. Defendant cites no authority to suggest that, in

order for the court to credit Siththy's photo array identification, the State was required to elicit testimony to establish that it complied with these procedural requirements. Defense counsel could have, but did not, cross-examine the State's witnesses to develop a record regarding these requirements. In sum, the record does not support defendant's attacks on the photo array, and his arguments regarding the fourth *Biggers* factor are unavailing.

¶ 68    Regarding the fifth and final *Biggers* factor—the length of time between the crime and the identification—defendant contends that the 10-day period between the April 3 carjacking and Siththy's photo array identification allowed "memory decay" that compromised her ability to accurately recall the offender. However, the 10-day interval certainly did not preclude the trial court from crediting Siththy's identification. We have found that equivalent or significantly longer lengths of time have not rendered identifications unreliable. See, *e.g.*, *Macklin*, 2019 IL App (1st) 161165, ¶ 30 (upholding identifications where "lineups were promptly conducted 10 days after the robbery); *People v. Green*, 2017 IL App (1st) 152513, ¶ 113 (upholding identification after three-month interval and noting "reviewing courts have found identifications reliable where nearly three months or more elapsed between the crime and the witness's identification"); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (upholding identification notwithstanding one year and four month interval).

¶ 69    In sum, the *Biggers* factors support the trial court's decision to find Siththy's identification reliable. The trial court could (and did) credit her identification and rely on it to convict defendant in case 16 CR 7564. See *Joiner*, 2018 IL App (1st) 150343, ¶ 47 (A single witness's identification is sufficient to sustain a conviction if the witness viewed the accused under

circumstances permitting a positive identification). We thus reject defendant's challenge to his convictions in case 16 CR 7564.[8]

¶ 70    We turn to defendant's contention that the court erred in imposing extended-term sentences upon each of his convictions for the Class 4 offenses of unlawful restraint and criminal trespass to residence in case 16 CR 7563.[9] He asserts that these extended sentences were improper pursuant to section 5-8-2(a) of the Unified Code of Corrections (730 ILCS 5/5-8-2(a) (West 2016)), because he was convicted and sentenced upon a more serious offense, specifically, the Class 2 offense of PSMV in case 16 CR 7562. On that basis, he requests that we either remand for resentencing or reduce each of his sentences for unlawful restraint and criminal trespass to residence to three years, *i.e.*, the maximum nonextended term for a Class 4 felony. See 730 ILCS 5/5-4.5-45(a) (West 2016).

¶ 71    As an initial matter, we note the State's contention that defendant's claim of error regarding the extended-term sentences is forfeited because he did not raise this argument at sentencing or in a motion to reconsider sentence. See *People v. Hillier*, 237 Ill. 2d. 539, 545 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a postsentencing motion raising the issue are required [Citations.]"). Defendant acknowledges that he did not preserve this claim but urges that we may review the issue under the plain-error doctrine. Alternatively, defendant contends that his trial counsel's failure to preserve the error in a postsentencing motion constitutes ineffective assistance of counsel. However, both parties are mistaken, as forfeiture

---

[8] As Siththy's testimony was independently sufficient evidence to affirm his convictions stemming from the April 3 carjacking of the Camry, we need not discuss defendant's contentions that there was no other admissible evidence of his guilt. That is, we need not decide defendant's claim that his custodial statement indicating he knew the Camry's location was an attempt to "negotiate a deal" that could not be used against him. See Ill. R. Evid. 410(4) (eff. Oct 15, 2015) (any statement made in the course of a plea discussion which does not result in a plea of guilty is not admissible in any criminal proceeding against the defendant).

[9] Defendant does not raise any challenge to the six-year sentence imposed on his conviction for possession of a controlled substance in case 16 CR 7563.

does not apply to the alleged error. "The imposition of an extended-term sentence without statutory authority results in a void sentence that is not subject to the rule of forfeiture." *People v. Collins*, 366 Ill. App. 3d 885, 900 (2006). This court has repeatedly rejected the State's attempt to apply forfeiture to a defendant's claim that an extended-term sentence was unauthorized under section 5-8-2(a) of the Unified Code of Corrections. See *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 99; *Collins*, 366 Ill. App. 3d at 900. Accordingly, we proceed to the merits of the claim.

¶ 72    Under section 5-8-2(a) of the Unified Code of Corrections, a defendant may be sentenced to an extended term if the sentence is "for an offense within the class of the most serious offense of which the offender was convicted," and if certain aggravating factors are present. 730 ILCS 5/5-8-2(a) (West 2016). Thus, the "imposition of extended-term sentences is limited * * * to offenses within the most serious classification. [Citation.]" *People v. Reese*, 2017 IL 120011, ¶ 83; *People v. Jordan*, 103 Ill. 2d 192, 205-06 (1984) ("the plain language of section 5-8-2(a) requires that, when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class.").

¶ 73    An "exception to that rule applies when extended-term sentences are imposed 'on separately charged, differing class offenses that arise from unrelated courses of conduct.' " *Reese*, 2017 IL 120011, ¶ 83 (quoting *People v. Coleman*, 166 Ill. 2d 247, 257 (1995)). In turn, to determine "whether a defendant's multiple offenses are part of an 'unrelated course of conduct' for the purpose of his eligibility for an extended-term sentence * * * courts must consider whether there was a substantial change in the nature of the defendant's criminal objective." *People v. Bell*, 196 Ill. 2d 343, 354-55 (2001). If there was a substantial change in the nature of the criminal

objective, the offenses are "part of an 'unrelated course of conduct' and an extended-term sentence may be imposed on differing class offenses." *Id.*

¶ 74    " 'The determination of whether a defendant's actions constitute a single course of conduct' or is part of an unrelated course of conduct 'is a question of fact for the trial court to determine, and a reviewing court will defer to the trial court's conclusion unless that conclusion is against the manifest weight of the evidence.' " *Robinson*, 2015 IL App 130837, ¶ 102 (quoting *People v. Hummel*, 352 Ill. App. 3d 269, 271 (2004)). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is readily apparent or when the finding appears to be unreasonable, arbitrary or not based on the evidence. [Internal quotation marks omitted.]" *Robinson*, 2015 IL App 130837, ¶ 102. "However, whether the trial court applied a proper construction of a statute is a question of law that we review *de novo*." *Id.*

¶ 75    In this case, the trial court at sentencing did not make any explicit finding as to whether the offenses were part of an unrelated course of conduct. In such a situation, our court applies the "presumption that a trial court knows the law and applies it," and so we "must presume that the trial court reasoned that there was a substantial change in defendant's criminal objective." *Id.* ¶ 103.

¶ 76    In this case, there is no dispute that defendant was sentenced to extended terms on Class 4 offenses in case 16 CR 7563 despite being sentenced upon PSMV, a Class 2 offense, in case 16 CR 7562. Thus, unless the exception for "unrelated courses of conduct" applies, the extended-term sentences would not be permissible. See *Reese*, 2017 IL 120017, ¶ 83. The State argues that the "unrelated course of conduct" exception applies because there was a substantial change in criminal objective between the offenses in those two cases. The crux of defendant's claim of

error then, is whether the court's presumed finding that there was substantial change in criminal objective was against the manifest weight of the evidence.

¶ 77    Defendant maintains that there was no substantial change in the criminal objective between the offenses in case 16 CR 7562 and the offenses of unlawful restraint and criminal trespass to residence in case 16 CR 7563, all of which occurred on April 27, 2016. In addition to emphasizing the short time frame in which these offenses were committed, defendant argues that the offenses in both cases stemmed from the same motive: his attempt to evade capture. He points out that in 16 CR 7562, he was charged and found guilty of aggravated assault against Johnson, stemming from his initial attempt to drive away from police in the RAV4. He notes that, after he crashed the RAV4, he "immediately went to Suwit's home to hide from the police." He argues that he was "fleeing from police" in 16 CR 7562 and was continuing do to so when he entered Suwit's residence "with the same motivation to avoid arrest." Thus, he posits that the offenses in both cases were part of a related course of conduct, the exception to the rule of section 5-8-2(a) of the Unified Code of Corrections does not apply, and so the extended-term sentences in case 16 CR 7563 are improper.

¶ 78    In response, the State posits that defendant's criminal objective substantially changed between commission of the PSMV offense in case 16 CR 7562 and the offenses of unlawful restraint and criminal trespass in case 16 CR 7563. Specifically, the State argues that possession of the stolen RAV4 was "complete even before he struck Officer Johnson" with the RAV4, and that his criminal objective changed when he broke into Suwit's family's home, at which point his purpose was "concealment and escape." The State acknowledges that the offenses in both cases occurred within a short period of time, and even concedes that defendant's motive for committing the offenses in 16 CR 7563 "may have been to escape his PSMV and aggravated

assault crimes" in 16 CR 7562. Nonetheless, the State cites a number of cases to argue that, in analogous circumstances, our court has found a change in criminal objective, so as to permit imposition of an extended-term sentence.

¶ 79    Among other cases, the State relies on *People v. Hummel*, 352 Ill. App. 3d 269 (2004), in which the Third District of this court affirmed the imposition of an extended-term sentence for aggravated battery, upon concluding that burglary and aggravated battery were part of a single course of conduct. In *Hummel*, the defendant acted as the "getaway driver" while his accomplices stole items from several stores. *Id.* at 270. At the last store, defendant refused to stop his car when confronted by a store employee. *Id.* Defendant's car accelerated, and the employee was "struck by the car or rolled onto the hood" before sliding off and striking her head. *Id. Hummel* reasoned that there was a "substantial change in the criminal objective * * * at the point the employee blocked the defendant's car" such that the "battery was a departure from the single course of conduct surrounding the burglary." *Id.* at 273. The court in *Hummel* found:

> "[T]he defendant's original objective was to stealthily obtain items of merchandise from the store * * *. Once * * * the store employees gave chase, the objective changed from merely avoiding detection to avoiding apprehension. [Citation.] More significantly, once the store employee placed herself in front of the defendant's car * * * the defendant's actions were directed specifically at that individual rather than at the store he had intended to rob. At that point, if not before, the defendant's course of conduct in committing the battery was unrelated to the objective in committing a burglary against the store." *Id.*

¶ 80    Other cases have followed *Hummel*'s approach to find that a defendant's criminal objective changed after being discovered while committing a crime. For example, in *People v. Collins*, 366

Ill. App. 3d 885 (2006), we affirmed imposition of an extended-term sentence for attempted robbery, over defendant's contention that the court had authority only to impose an extended sentence for PSMV, the most serious offense of which he was convicted. The victim testified that he saw the *Collins* defendant drive away in the victim's van, after which the victim caught up to the van on foot. *Id.* at 888. When the victim confronted defendant, defendant demanded money and a struggle ensued. *Id.* at 888-89. Citing *Hummel*, this court in *Collins* reasoned that: "defendant's first offense [PSMV] was one he sought to commit without violence; his goal was to enter the van without being seen and drive off in it. When [victim] caught up with him * * * defendant's goal changed from avoiding detection to violently confronting the victim to obtain his money." *Id.* at 902. On that basis, we found that "defendant's actions arose from an unrelated course of conduct." *Id.*

¶ 81    Significantly, however, a more recent decision of our court, *People v. Robinson*, 2015 IL App (1st) 130837, strongly criticized *Hummel* and cautioned against finding that a crime committed in an attempt to evade capture reflects a change in criminal objective. In *Robinson*, defendant was convicted of residential burglary and aggravated battery. *Id.* ¶ 1. The victim encountered defendant in the victim's apartment and saw defendant attempting to remove a television. *Id.* ¶ 11. The victim blocked the doorway to prevent defendant's escape and a fight ensued, in which defendant bit the victim. *Id.* Defendant was sentenced to 30 years for residential burglary and the court imposed a seven-year extended-term sentence for aggravated battery. *Id.* ¶ 42. The trial court in *Robinson* "made no explicit statement finding that defendant's criminal objective changed between the residential burglary and the aggravated battery." *Id.* ¶ 103.

¶ 82    On appeal, defendant argued that the extended-term sentence for aggravated battery was void pursuant to section 5-8-2(a) of the Unified Code of Corrections, insofar as residential burglary

was the most serious offense. *Id.* ¶ 100. Our court agreed that the extended-term sentence was erroneous because defendant's criminal objective did not change between the burglary and the fight with the victim. *Id.* ¶¶ 103-112. We explained that the defendant intended to steal but "did not have an independent objective to harm [the victim]." *Id.* ¶ 108. We noted that the victim acknowledged that he prevented the defendant from leaving and that, had he not done so, it was "quite likely that defendant would have simply fled the scene." *Id.* We concluded: "defendant's only real objective was to finish what he had started, burglarizing [the victim] and then escaping, and any harm done to [the victim] was merely a means to effectuate that objective." *Id.*

¶ 83 Our court in *Robinson* went on to expressly criticize *Hummel*, cautioning:

> "In creating the 'substantial change in criminal objective test, our supreme court specifically reasoned that it wanted to avoid creating a test in which virtually all crimes involving multiple offenses would be liable to have extended terms imposed on the lesser offense. *Bell*, 196 Ill.2d at 353. Yet, in *Hummel*, this is exactly what was done. * * * Under *Hummel*, almost any time offenders ran from the police they would be liable for an extended-term sentence because their criminal objective had shifted from whatever crime they were effectuating to 'escape.' Such a result seems to be incongruous with our supreme court's reasoning for adopting the 'substantial change in criminal objective' test." *Id.* ¶ 109.

¶ 84 On the record before us, we find the reasoning of *Robinson* is persuasive. The evidence in this case does not reflect that defendant had any substantial change in criminal objective in the short time between when police found him in the stolen RAV4 (giving rise to the charges in case 16 CR 7562) and when he entered Suwit's residence, giving rise to the unlawful restraint and

criminal trespass offenses in case 16 CR 7563. To the contrary, the evidence indicates that the sole purpose for defendant entering the apartment was to conceal himself from the police pursuit immediately after he was located in the RAV4. This situation is analogous to *Robinson*, where the defendant fought the victim only in an attempt to effectuate his escape after he was discovered committing a burglary. 2015 IL App 130837, ¶ 108.

¶ 85 In sum, the evidence does not support a finding that there was a "substantial change in defendant's criminal objective." *Bell*, 196 Ill. 2d at 354. In turn, the crimes in cases 16 CR 7562 and 16 CR 7563 "are not part of an unrelated course of conduct." *Id.* We thus conclude that the exception to section 5-8-2(a) does *not* apply, and the trial court could only impose an extended-term sentence "on those offenses within the most serious class." *Id.* at 355. Since defendant's PSMV conviction was a Class 2 offense (625 ILCS 5/4-103 (West 2016), the court was not authorized to impose an extended-term sentence on the Class 4 offenses of unlawful restraint (720 ILCS 5/10-3 (West 2016)) and criminal trespass to residence (720 ILCS 5/19-4(2) (West 2016)).

¶ 86 With respect to a remedy, "[a] reviewing court may modify a sentence that was ordered in error. [Citations.]" *Robinson*, 2015 IL App (1st) 130837, ¶ 113. Illinois Supreme Court Rule 615(4) authorizes this court to "reduce the punishment imposed by the trial court." In *Robinson*, after we determined that an extended-term sentence was improperly imposed on Class 3 offense of aggravated battery, we reduced the sentence to the maximum nonextended term for that class of offense. *Robinson*, 2015 IL App (1st) 130837, ¶ 113; see also *People v. Ware*, 2014 IL App (1st) 120485, ¶ 32 (Where a "trial court improperly imposes an extended term, but it is clear from the record the trial court intended to impose the maximum available sentence, we may use our power

under Illinois Supreme Court Rule 615(b)(4), to reduce the sentence to the maximum nonextended term sentence. [Citation.]").

¶ 87    We believe the approach taken in *Robinson* is proper here with respect to each of the extended-term sentences that were imposed on defendant's four unlawful restraint convictions and the single conviction for criminal trespass to residence, which were Class 4 felonies. 720 ILCS 5/10-3(b) (West 2016); 720 ILCS 5/19-4(a)(2),(b)(2) (West 2016). The maximum nonextended sentence for a Class 4 felony is three years' imprisonment. 730 ILCS 5/5-4.5(a) (West 2016). Accordingly, we reduce the sentences on each of those five counts to three-year sentences, to be served concurrently. We otherwise leave intact the trial court's sentencing determinations, including that the sentences imposed in 16 CR 7563 will run concurrent with the sentences imposed in the other two cases.

¶ 88                                                                   CONCLUSION

¶ 89    For the foregoing reasons, we affirm each of defendant's convictions. However, imposition of extended-term sentences was improper with respect to each of the four convictions of unlawful restraint and the single conviction of criminal trespass to residence in case 16 CR 7563. We modify the mittimus to reflect that the sentences on each of those offenses are reduced to three-year sentences, to run concurrently.

¶ 90    Affirmed in part; reversed in part; mittimus corrected.